## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ADRIENNE LEWIS, by and on behalf of the minor child LIYAH ALEXANDRIA JOHNSON, | *  CIVIL DOCKET NUMBER: 3:16-cv-352-<br>*  JWD-RLB |
| Plaintiff, | * |
| VERSUS | * |
| CITY OF BATON ROUGE/PARISH OF EAST BATON ROUGE; SHERIFF SID J. GAUTREAUX, III, SHERIFF OF EAST BATON ROUGE PARISH; LIEUTENANT COLONEL DENNIS GRIMES, WARDEN OF EAST BATON ROUGE PARISH PRISON; LIEUTENANT MICHAEL DUPLESSIS; DEPUTY AVERY KUJAWA; DEPUTY DALTON CANEZARO; CORPORAL CEDRIC BUCKNER; CORPORAL ROBB; SARGENT BROADWAY; J. DOES #50-99; COLUMBIA CASUALTY COMPANY, CNA INSURANCE COMPANY. | *  JUDGE: John W. deGravelles<br>*<br>*  MAG: Richard L. Bourgeois, Jr<br>*<br>*  JURY TRIAL DEMANDED |
| Defendants. | * |

*********************************

## AMENDED COMPLAINT

Adrienne Lewis, by and on behalf of the minor child Liyah Alexandria Johnson, files this First Amended Complaint against defendants for the death of Lamar Alexander Johnson, the father of Liyah Johnson. Lamar Johnson ("Mr. Johnson") died as a result of both unconstitutional conditions of confinement and particular individual defendants' deliberate indifference to Mr. Johnson's constitutional rights.

In support of these claims, Adrienne Lewis, by and on behalf of the minor child Liyah Johnson ("Plaintiff"), shows as follows:

## I.    JURISDICTION

1.

This action is brought pursuant to 42 U.S.C. § 1983, pursuant to the Eighth and Fourteenth Amendments to the United States Constitution.  Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343, and the aforementioned statutory and constitutional provisions.  In addition, Plaintiffs invoke supplemental jurisdiction over claims under state constitutional and statutory law pursuant to 28 U.S.C. §1367.

## II.    PARTIES

2.

Liyah Alexandria Johnson is the minor child of Mr. Johnson (deceased) and appears through her mother and natural tutrix **ADRIENNE LEWIS**, who is a person of the full age of majority and a resident of Louisiana currently domiciled in New Orleans, Louisiana.

3.

**LIYAH ALEXANDRIA JOHNSON** is the minor child of **LAMAR JOHNSON**.

Named defendants herein are:

4.

**CITY OF BATON ROUGE/PARISH OF EAST BATON ROUGE ("CITY-PARISH")** is a political entity capable of suing and being sued.  The **CITY-PARISH** is the entity responsible for funding operations and maintenance, including necessary improvements, repairs, routine daily maintenance, purchase of equipment, supplies, and materials needed for such purposes, and for utility services, of the EBRPP.  In addition, the **CITY-PARISH** is responsible for the food, clothing, medical treatment, and related expenses for prisoners housed in the EBRPP, including mental health services.

5.

**SHERIFF SID J. GAUTREAUX, III (hereinafter, "GAUTREAUX")** a person of full age of majority and a resident of Louisiana, in his individual and official capacity as the Sheriff of East Baton Rouge Parish.  At all times described herein, **GAUTREAUX** was the ultimate policy-maker for the East Baton Rouge Parish Sheriff's Office, and was responsible for the hiring, training, supervision, discipline and control of appropriate staff to maintain the care, custody, and control of prisoners in the custody of the East Baton Rouge Parish Sheriff's Office. He was responsible for all staffing levels of the EBRPP.  He was also responsible for the supervision, administration, policies, practices, customs, and operations of EBRPP. **GAUTREAUX** was and is a final policy maker who at times delegated policy making authority to other defendants named in this lawsuit.  At all pertinent times, **GAUTREAUX** was acting under color of law.  He is liable both directly for the unconstitutional actions and vicariously for the state law actions complained of herein.

6.

**LIEUTENANT COLONEL DENNIS GRIMES (hereinafter, "GRIMES")** a person of the full age of majority and a resident of Louisiana, in his individual and official capacity as warden of the EBRPP.  At all times described herein, **GRIMES** was the Warden of the EBRPP, and as such was responsible for supervision, administration, policies, practices, customs, operations, training of staff, and operation of the EBRPP.  **GRIMES** was and is a final policy maker who at times delegated policy making authority to other defendants named in this lawsuit. At all pertinent times, **GRIMES** was acting under color of law.  He is liable both directly for the unconstitutional actions and vicariously for the state law actions complained of herein.

7.

**LIEUTENANT MICHAEL DUPLESSIS (hereinafter, "DUPLESSIS")** in his individual and official capacities as an employee of the East Baton Rouge Sheriff's Office and a supervisor of deputies. **DUPLESSIS** is an adult citizen of the State of Louisiana and domiciled in Louisiana. At all pertinent times, **DUPLESSIS** was employed by the East Baton Rouge Sheriff's Office and assigned as a supervisor to posts at the EBRPP in locations where Mr. Johnson was housed. He was responsible for ensuring appropriate care, custody, and control occurred, including respecting all prisoners' rights, including those of Mr. Johnson, and for communicating serious medical conditions, including mental health concerns and risks of suicide, of prisoners to appropriate medical staff and/or mental health professionals. He was also responsible for supervising deputies on their shifts to ensure that deputies under his supervision carried out all duties in accordance with their obligations to respect all prisoners' rights. **DUPLESSIS** was acting at times and in particular duties as a final policy maker, having been delegated the authority to do so by Sheriff **GAUTREAUX** and Warden **GRIMES**. **DUPLESSIS** is liable both directly for the unconstitutional actions and vicariously for the state law actions complained of herein. When he was not acting as a final policy maker, **DUPLESSIS** acted under the direction of defendants Sheriff **GAUTREAUX** and Warden **GRIMES**.

8.

**DEPUTY AVERY KUJAWA, DEPUTY DALTON CANEZARO, CORPORAL CEDRIC BUCKNER, CORPORAL ROBB, AND SARGENT BROADWAY**, in their individual and official capacities as employees of EBRPP. **KUJAWA, CANEZARO, BUCKNER, ROBB,** and **BROADWAY** are all adult citizens and residents of Louisiana. At all pertinent times, **KUJAWA, CANEZARO, BUCKNER, ROBB,** and **BROADWAY,** were employed by the East Baton Rouge Sheriff's Office and assigned to posts at the EBRPP in

4

locations were Mr. Johnson was housed, where he exhibited extreme emotional distress, and for **KUJAWA** and **CANEZARO**, where Mr. Johnson was found hanging. **BUCKNER, ROBB,** and **BROADWAY** physically assaulted Mr. Johnson. All were responsible for ensuring that appropriate care, custody, and control occurred, including respecting Mr. Johnson's rights, and for communicating serious medical conditions, including mental health concerns and risks of suicide, of prisoners to appropriate medical staff and/or mental health professionals. **KUJAWA, CANEZARO, BUCKNER, ROBB,** and **BROADWAY** were acting at times and in particular duties as final policy makers, having been delegated the authority to do so by Sheriff **GAUTREAUX** and Warden **GRIMES**. When they were not final policy makers, they acted under the direction of defendants Sheriff **GAUTREAUX** and Warden **GRIMES**.

9.

**J. DOES #50-99** were at all relevant times adult residents of Louisiana who were acting under color of state law and were employees or agents of the defendants Sheriff **GAUTREAUX** and Warden **GRIMES**. **J. DOES #50-99** are liable both directly for the unconstitutional actions and vicariously for the state law actions complained of herein. The Plaintiff is unaware of the true names and capacities of these Defendants and therefore sues those persons by fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained and intends to seek immediate discovery from the Defendants to determine the identity of John Does 50-99.

10.

**COLUMBIA CASUALTY COMPANY, CNA INSURANCE COMPANY** is a domestic or foreign insurance corporation authorized to do and doing business in the State of Louisiana, which at all times mentioned herein provided defendant Sheriff **GAUTREAUX** and

5

the East Baton Rouge Sheriff's Office with a policy of liability insurance for the acts complained of herein.

### III.    FACTUAL ALLEGATIONS

11.

On May 26, 2015, Mr. Johnson was arrested by City of Baker, LA, police after a routine traffic stop for tinted windows.  Video and audio of the arrest show Mr. Johnson to be relaxed, engaged, and in complete control of his emotions.  Within an hour he was booked into the EBRPP because Jefferson Parish authorities placed a hold on Mr. Johnson for a four-year old arrest warrant for a non-violent charge.

12.

On May 27, 2016, after spending almost a day in the central booking portion of EBRPP, Mr. Johnson was moved to Unit I's Q8 dorm.

13.

Q8 is segregated by race and houses exclusively African-American male prisoners.

14.

Incarcerated individuals in Q8 share a dayroom and living area with those in Q7.  Q7 is also segregated by race and houses exclusively African-American male prisoners.

15.

EBRPP authorities choose to assign only one to two staff to monitor the combined eighty to one hundred prisoners assigned to Q7 and Q8.  Guards rarely monitor the living areas. Defects in physical design and manner of operation, including inadequate staffing, inadequate supervision techniques, and poor sightlines, produce frequent violence and a continuous pattern of constitutional deprivations for the prisoners assigned to the units, including Mr. Johnson

16.

On May 28, 2016, while in EBRPP and assigned to Q8, Mr. Johnson pleaded guilty to a Baton Rouge ordinance for not having his driver's license in his possession in 2009. He was sentenced to five (5) days, with credit for time served since May 26, 2015.

17.

According to interviews with individuals incarcerated with Mr. Johnson, synthetic marijuana called "mojo" is readily accessible by prisoners at EBRPP. The National Institute on Drug Abuse notes that synthetic marijuana "can be unpredictable and, in some cases, severe or even life-threatening." On information and belief, while housed on Q8, Mr. Johnson was able to acquire and consume mojo.

18.

Mr. Johnson's reaction to mojo was severe. He suffered paranoid delusions and began talking out loud to himself. His extreme emotional distress was apparent to anyone within sight and sound of Mr. Johnson. Rather than provide any medical or mental health care, EBRPP staff ignored Mr. Johnson's serious mental health needs.

19.

While still on Q8, Mr. Johnson was assaulted by defendants ROBB, BROADWAY, JOHN DOE, and possibly BUCKNER. Mr. Johnson had requested a blanket, and after repeating the request for a blanket, ROBB starting yelling at Mr. Johnson and BROADWAY, JOHN DOE, or possibly BUCKNER cursed Mr. Johnson and insulted his mother. Mr. Johnson responded by jumping off of his bed and talked back, when defendants ROBB, BROADWAY, JOHN DOE, and possibly BUCKNER physically attacked Mr. Johnson. They beat Mr. Johnson, handcuffed him, beat him while he was handcuffed, and pepper sprayed him. This violent and abusive

response by defendants ROBB, BROADWAY, JOHN DOE, and possibly BUCKNER exacerbated Mr. Johnson's condition, making him more paranoid and delusional.

20.

The only official document from EBRPP reflecting Mr. Johnson's experience in Unit I's Q8 dorm is a "disciplinary report" issued by defendant BUCKNER and approved by defendant DUPLESSIS.  The report is false and/or omits crucial facts.  In his report, BUCKNER fails to accurately reflect Mr. Johnson's emotional distress and instead seeks to punish Mr. Johnson for requesting that he be moved out of Q8.

21.

Another official document from EBRPP notes that Mr. Johnson was moved to EBRPP's Unit II "for protection."  Although no official document available through requests for public records notes that Mr. Johnson was in any emotional distress, according to interviews with individuals incarcerated with Mr. Johnson, Mr. Johnson was loudly, openly, and clearly in great emotional distress.  Individuals incarcerated with Mr. Johnson who were eyewitnesses describe his condition as paranoid and suicidal, reporting specifically that Mr. Johnson was talking about killing himself, "not wanting to live" and stating he "couldn't take it" anymore.

22.

Defendants KUJAWA, CANEZARO, and J. DOES #50-99 witnessed Mr. Johnson's extreme emotional distress and suicidal statements but chose to ignore his condition.

23.

Defendants KUJAWA, CANEZARO, and J. DOES #50-99 witnessed Mr. Johnson's extreme emotional distress and suicidal statements but failed to follow EBRPP policy by not transporting Mr. Johnson to a mental health or any other health care professional, or otherwise seeking mental health care for Mr. Johnson.

24.

Despite the obvious indications that Mr. Johnson was suffering an emotional breakdown, was suicidal, and in acute mental health distress, EBRPP officials failed to perform a mental health assessment of Mr. Johnson.

25.

Despite Mr. Johnson's clear emotional distress and suicidal statements, EBRPP staff placed Mr. Johnson in Unit II's M01 wing, a row of solitary isolation cells. Interviews with individuals incarcerated with Mr. Johnson report that EBRPP deputies, including defendants KUJAWA, CANEZARO, and J. DOES #50-99, use M01 to house mentally ill prisoners as a means to deny such prisoners access to mental health care.

26.

EBRPP deputies, including defendants KUJAWA, CANEZARO, and J. DOES #50-99, are required to monitor the individuals in M01 regularly. Interviews with individuals incarcerated with Mr. Johnson report that EBRPP guards are supposed to monitor the tier every fifteen (15) to thirty (30) minutes, but rarely do so. Instead, individuals incarcerated with Mr. Johnson report that the EBRPP deputies, including defendants KUJAWA, CANEZARO, and J. DOES #50-99, falsely write in the logbook that they make their rounds.

27.

While in cell three (3) on M01, Mr. Johnson was assaulted by defendants J. DOES #50-99 twice. On the first occasion, defendants J. DOES #50-99 entered Mr. Johnson's cell. Although eyewitnesses could not see inside the cell, an individual incarcerated with Mr. Johnson reports hearing screams from defendants J. DOES #50-99 toward Mr. Johnson, and hollering from Mr. Johnson like he was being beaten and pepper sprayed.

28.

On the second occasion, as Mr. Johnson was restrained with handcuffs, defendants J. DOES #50-99 removed Mr. Johnson from cell three (3) and dragged him to the control key area of M01 and M02 and beat him again.

29.

Consistent with EBRPP's practice and custom, no logbook entries were made reflecting defendants J. DOES #50-99 entries into Mr. Johnson's cell, and no incident report was created reflecting defendants J. DOES #50-99 use of force upon Mr. Johnson.

30.

EBRPP documents conflict as to how much time Mr. Johnson spent in solitary isolation. According to the documents, Mr. Johnson either spent more than twenty-four or fewer than twenty hours in solitary isolation. The EBRPP documents state that Mr. Johnson was permitted out of his cell for a total of seven minutes, when he was in cell three (3).

31.

Official EBRPP documents prepared by defendants KUJAWA and CANEZARO claim that KUJAWA conducted monitoring rounds of Unit II's M01 isolation cells approximately every thirty minutes during the early morning hours of May 30, 2015. From 7:11 to 9:43 a.m. on May 30, 2015, KUJAWA claims he made six rounds to monitor prisoners in Unit II's M01 isolation cells. Upon each alleged contemporaneous entry, KUJAWA wrote "inmates appear to be resting."

32.

From 7:00 a.m. to 10:10 a.m. on May 30, 2015, CANEZARO claims KUJAWA made four rounds to monitor prisoners in Unit II's M01 isolation cells. Upon each alleged contemporaneous entry, CANEZARO wrote "all seems secure." Depending on which EBRPP

official document is accurate, Mr. Johnson was "secure" and "resting" at either 10:10 a.m. (CANEZARO) or 9:43 a.m. (KUJAWA).

33.

According to official documents from EBRPP, on May 30, 2015, at 10:22 a.m., Mr. Johnson was found hanging from his cell bars.  Mr. Johnson left EBRPP on a stretcher, brain damaged, but alive.  He died a few days later at a local hospital.

34.

Consistent with EBRPP's practice and custom, no logbook entries reflect Mr. Johnson's movement from cell three (3) to cell seventeen (17), where he was found hanging.

35.

Interviews with individuals incarcerated with Mr. Johnson report grossly inadequate evaluation, monitoring, and treatment of prisoner's health care at EBRPP.

36.

Media reports subsequent to Mr. Johnson's death quote health care professionals noting a "significant decline in the quality of care . . . over the past six or seven years," critical health conditions at the prison, and chronic understaffing.

37.

A recent independent evaluation of the system called the health care provided to prisoners at EBRPP "episodic and inconsistent."

38.

Interviews with individuals incarcerated with Mr. Johnson report that the general conditions at EBRPP, by any measure, shock the conscience.  They report:

- Contraband, specifically mojo, is "prevalent," causing some who consumes it to become "crazy" and be placed in the "crazy man cells"—M01.  Two individuals incarcerated with Mr. Johnson named the price for a "stick" of mojo: $5.00;

- Some units, specifically A3, A2, F4, F5, and B3, are called the "dungeon" because EBRPP deputies assigned to monitor the units do not do so regularly and falsely log that they make rounds.  The result is often unregulated prisoners who resort to "violence what seems like every day;"

- Unit Q7-8 "was a very dangerous place, especially if you did not know anyone.  It was like chaos, a lot of gambling, card playing, and fights;"

- Health care providers who fail to do their job, and retaliate against prisoners who seek help and safety.  One interview with an individual incarcerated with Mr. Johnson reports that, after he suffered a broken jaw after an attack by another prisoner, he sat in the holding tank of the medical unit for hours awaiting transport to the hospital bleeding from his mouth, with nothing for the great pain and only a plastic bag to capture the blood mixed with saliva dripping from his mouth.  Once he returned to the facility and was recuperating in the medical unit, he was moved to M01 by a nurse as retaliation for continually insisting that he receive the amount of Ensure prescribed to him each day;

- Arbitrary physical violence by guards, including beating prisoners in the visitation booth because of the absence of cameras, beating prisoners and placing them on lockdown to deny them access to their families until their wounds heal, and guards who witness colleagues beating prisoners and failing to report the assaults.

39.

Consistent with EBRPP's practice and custom, defendants KUJAWA, CANEZARO, and J. DOES #50-99 failed to document the locations of prisoners.  This allows, as in Mr. Johnson's case, EBRPP staff to move prisoners around the facilities with no accountability or supervision. Indeed, no official document from EBRPP exists that indicates Mr. Johnson was ever transferred to Unit II, M01 cell seventeen, where he hanged himself.

40.

Consistent with EBRPP's practice and custom, defendants KUJAWA, CANEZARO, and J. DOES #50-99, failed to monitor prisoner living areas, including the isolation cells in Unit II's M01.  Interviews with individuals incarcerated with Mr. Johnson report that M01 is officially or unofficially designated for prisoners with serious mental health needs and contains at least two cells designated for suicidal prisoners—cells one and two—because they are close to the control unit occupied by EBRPP staff.  Such proximity is supposed to allow monitoring of suicidal prisoners without having to physically make monitoring rounds, i.e. walk the hallway in front of the cells.  Defendants KUJAWA and CANEZARO, by failing to place Mr. Johnson in cell one or two, and by failing to physically walk the halls to monitor Mr. Johnson's cell even though they had knowledge of his acute emotional distress, permitted Mr. Johnson to hang himself.

41.

Consistent with EBRPP's practice and custom, defendants KUJAWA, CANEZARO, and J. DOES #50-99 falsely documented that EBRPP staff make regular monitoring rounds to supervise prisoners.

42.

Consistent with EBRPP's practice and custom, defendants KUJAWA, CANEZARO, BUCKNER, DUPLESSIS, and J. DOES #50-99 failed to provide Mr. Johnson sufficient access to qualified medical and mental health care.

43.

Consistent with EBRPP's practice and custom, defendants ROBB, BROADWAY, JOHN DOES 50-99, and possibly BUCKNER, physically assaulted Mr. Johnson. The unauthorized and unnecessary use of force on Mr. Johnson as he was clearly emotionally distressed exacerbated his mental illness and made it more likely, not less, that he would hurt himself.

44.

Defendants GAUTREAUX and GRIMES failed to adequately staff and train employees responsible for providing constitutionally adequate medical and mental health care at EBRPP. Rather than provide access to mental health care to suicidal and obviously mentally ill prisoners, including Mr. Johnson, defendants GAUTREAUX and GRIMES permitted public officials in their employ to place such prisoners in M01, a dangerous, filthy, loud, and unmonitored solitary confinement unit of EBRPP.

45.

Defendants CITY-PARISH failed to provide sufficient funding and oversight to all defendants, resulting in unconstitutional conditions of confinement at the EBRPP. The CITY-PARISH explicit policy of not sufficiently funding and overseeing the EBRPP caused defects in physical design and manner of operation, including inadequate staffing, inadequate supervision techniques, and/or poor sightlines at the EBRPP, resulting in a continuous pattern of constitutional deprivations for all prisoners in EBRPP, including Mr. Johnson.

46.

The failures of all defendants are well known and consistent with a pattern and practice resulting in a decrepit physical plant, rampant violence, and deliberate indifference to the basic human needs, including medical and mental health care, of prisoners at EBRPP, including the following examples:

    a.      Since 2013, at least four people died at the jail due to inadequate medical and mental health care;

    b.      In February of 2015, defendant GRIMES publically acknowledged that cell doors in the EBRPP do not open and shut due to rust, the layout of the prison makes it difficult to monitor prisoners, and overpopulation requires sending hundreds of prisoners to other parishes;

    c.      In October of 2015, a Baton Rouge elected officials complained of a study into the medical care at EBRPP, noting that "the council already knows about numerous problems" including understaffing, medical equipment shortages, and insufficient compensation for medical professionals;

    d.      Also in October of 2015, defendant GAUTREAUX was cited as requesting a new jail "for years" and that "officials long ago identified the problem: a dilapidated facility that is ill-equipped to hold . . . mentally ill who are booked";

    e.      In February of 2016, a seventeen-year-old boy died at the hands of his cellmate. Even though witnesses could hear the victim cry "I give up," EBRPP staff did not intervene in time to stop the murder.

47.

At all times relevant to this complaint, defendants acted under color of state law.

48.

At all times mentioned herein, all the defendants named in their individual capacities were employed by the defendants SHERIFF SID GAUTREAUX and were acting in the course and scope of their employment with defendant SHERIFF SID GAUTREAUX.

49.

All of the defendants are liable to the plaintiffs for compensatory and punitive damages.

15

50.

All of the defendants are liable jointly, severally, and in solido for the plaintiffs' injuries.

51.

The defendants' actions were reckless, willful, wanton, and malicious, and constituted deliberate indifference to the rights of the plaintiffs.  The defendants' actions were the proximate cause of the injuries and death of Mr. Johnson and the damages of the plaintiffs.

## IV.    CAUSES OF ACTION

### COUNT 1 – § 1983 Violation Based on the De Facto Policy, as Evidenced by Extended, Pervasive Misconduct by EBRPP Staff, That Create Conditions and Treatment That Constitutes Impermissible Punishment of Prisoners Under the Due Process Clause— Defendants GAUTREAUX, GRIMES, and CITY-PARISH (Official Capacities)

Plaintiffs repeat and re-allege each and every allegation of the complaint.

52.

The defendants named in this Count, acting individually and together, under color of law, acted to violate the Mr. Johnson's right to be free from punishment without due process as protected by the Eighth and Fourteenth Amendments of the United States Constitution and 42 USC § 1983.  They did so by exposing prisoners at the EBRPP, including Mr. Johnson, to violent and dangerous conditions of confinement so extensive and pervasive that they reflect a *de facto* policy approved by the defendants named in this Count.  Such policies and practices include, but are not limited to, racial segregation of prisoner living areas, defects in physical design and manner of operation, including inadequate staffing, inadequate supervision techniques, poor sightlines, and inadequate monitoring of prisoner living areas that combined to result in frequent violence and a continuous pattern of constitutional deprivations for the prisoners in EBRPP, including Mr. Johnson.  In addition, defendants GAUTREAUX and GRIMES knew or should have known that guards engage in illegal conduct including the falsifying of EBRPP monitoring logs, physical abuse of prisoners, and permitting the smuggling

16

of drugs into EBRPP, primarily "mojo," synthetic marijuana.  Finally, all defendants named in this count failed to provide appropriate medical and mental health services to EBRPP prisoners, including Mr. Johnson, who was individually harmed by the *de facto* policies and practices described above.

**COUNT 2 – *Monell* Violation of § 1983 Based on Unconstitutional Conditions of Confinement That Constitutes Impermissible Punishment of Prisoners Under the Due Process Clause— Defendants GAUTREAUX, GRIMES, and CITY-PARISH (Official Capacities)**

53.

Plaintiffs repeat and re-allege each and every allegation of the complaint.

54.

The defendants named in this Count, GAUTREAUX, GRIMES, and CITY-PARISH, acting individually and together, under color of law, acted to violate Mr. Johnson's right to be free from cruel and unusual punishment without due process as protected by the Eighth and Fourteenth Amendments of the United States Constitution and 42 USC § 1983.  They did so by maintaining policies, patterns or practices that created unconstitutional conditions of confinement that deprived prisoners, including Mr. Johnson, of basic human needs, including physical safety and mental health care.

55.

Mr. Johnson and the plaintiffs were individually harmed by these policies, patterns, or practices because they resulted in the death of Mr. Johnson, who was exposed to a continuous pattern of deprivations which clearly violated the United States Constitution.  The policies and practices adopted by the defendants in this Count, whether explicit or *de facto* as evidenced by the extended and pervasive misconduct by EBRPP and CITY-PARISH officials, include but are not limited to: racial segregation of prisoner living areas, defects in physical design and manner

17

of operation, including inadequate staffing, inadequate supervision techniques, poor sightlines, and inadequate monitoring of prisoner living areas that combined to result in frequent violence and a continuous pattern of constitutional deprivations for the prisoners in EBRPP, including Mr. Johnson.  In addition, defendants GAUTREAUX and GRIMES knew or should have known that guards engage in illegal conduct including the falsifying of EBRPP monitoring logs, physical abuse of prisoners, and permitting the smuggling of drugs into EBRPP, primarily "mojo," synthetic marijuana.    Finally, all defendants named in this count failed to provide appropriate medical and mental health services to EBRPP prisoners, including Mr. Johnson, who was individually harmed by the *de facto* policies and practices described above and resulted in Mr. Johnson's death.

56.

At all pertinent times, the defendants named in this Count, individually and collectively, acted unreasonably, recklessly, and with deliberate indifference and disregard for the safety, constitutional, and civil rights of the plaintiffs by establishing the above-described policies, patterns, or practices.  The above-named defendants are therefore liable to the plaintiffs for the violation of constitutional rights described above pursuant to *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978).

**COUNT 3 — § 1983 Violation Based on Establishment of a System in which Prisoners with Serious Mental Health Issues are Denied Access to Appropriate Medical Care — Defendants GAUTREAUX and CITY-PARISH (Official Capacities)**

61.

Plaintiffs repeat and re-allege each and every allegation of the complaint.

57.

The defendants named in this Count, acting individually and together, under color of law, violated the Mr. Johnson's right to be free from cruel and unusual punishment and the right to

18

due process as protected by the Eighth and Fourteenth Amendments of the United States Constitution and 42 USC § 1983. They did so by coordinating with CITY-PARISH's Emergency Medical Services and Prison Medical Services to provide inadequate and insufficient services for medical and mental health care that they knew would result in the deprivation of adequate medical and mental health care for prisoners with serious medical conditions, namely, serious mental health conditions. Plaintiffs were individually harmed by the insufficiency of the contract and the failure to make other accommodations to provide mental health services because they resulted in the death of Mr. Johnson, who was deprived of appropriate mental health and medical treatment after he was booked into EBRPP, which deprivation resulted in his death, as described above.

58.

At all pertinent times, the defendants named in this Count, individually and collectively, acted unreasonably, recklessly, and with deliberate indifference and disregard for the safety, constitutional, and civil rights of Mr. Johnson by failing to provide appropriate medical and mental health services.

**COUNT 4 – § 1983 Violation Based on Failure to Supervise Other Defendants to Ensure Prisoners Received Appropriate Care for Serious Medical Needs— Defendants GAUTREAUX and GRIMES (Individual and Official Capacities)**

59.

Plaintiffs repeat and re-allege each and every allegation of the complaint.

60.

Defendants GAUTREAUX and GRIMES, in their individual and official capacities, failed to supervise their subordinates, namely Lt. DUPLESSIS, Deputy KUJAWA, Deputy CANEZARO, Corporal BUCKNER, Corporal ROBB, Sargent BROADWAY, and John Does #50-99, to ensure that these subordinates did not ignore prisoners' requests for medical and/or

mental health treatment, fail to refer prisoners needing treatment to appropriate mental health professionals, and/or fail to properly monitor prisoners who report suicidal ideation or show signs of mental health crisis.  The plaintiff was directly harmed by this failure to supervise because it caused the death of Mr. Johnson, who was either left untreated or received patently insufficient treatment for his serious medical and mental health needs from the specified defendants.  At all pertinent times herein, defendants GAUTREAUX and GRIMES were aware of the need to supervise their subordinates in order to ensure that they did not violate prisoners' rights.  These defendants ignored that need and acted unreasonably and with deliberate indifference and disregard for the safety of Mr. Johnson, as described above.

### COUNT 5 – § 1983 Violation Based on Deliberate Indifference to Mr. Johnson's Constitutional Right to Appropriate Medical and Mental Health Care— Defendants DUPLESSIS, KUJAWA, CANEZARO, BUCKNER, and JOHN DOES #1-99 (Individual and Official Capacities)

61.
Plaintiffs repeat and re-allege each and every allegation of the complaint.

62.
The above-named defendants, acting individually and together, and under color of law, engaged in a course of conduct and conspired to engage in a course of conduct that acted to deprive Mr. Johnson of his constitutional rights and did deprive him of said rights, specifically, the right to reasonable and adequate medical and mental health care, the right to be free from cruel and unusual punishment, and the right to be free from punishment without due process as protected by the Eighth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.  At all times pertinent herein, these defendants, acting individually and collectively, acted unreasonably, recklessly, maliciously, and/or with deliberate indifference and disregard for the constitutional and civil rights and life and serious medical needs of the

deceased, Mr. Johnson.   Furthermore, these defendants, individually and collectively, had the duty and ability to intervene to prevent the violations of the rights of Mr. Johnson, as described herein, but failed to do so.   Finally, these defendants acted as a final policy maker when they placed Mr. Johnson in an inappropriate wing of EBRPP and deprived Mr. Johnson of reasonable and adequate medical and mental health care, having been delegated the authority to do so by Sheriff **GAUTREAUX** and Warden **GRIMES**.

### COUNT 6 – *Monell* Violation of § 1983 Based on Establishment of Policies, Patterns or Practices pursuant to which Prisoners with Serious Mental Health Conditions are Denied Access to Appropriate Medical Care— Defendants GAUTREAUX and CITY-PARISH (Official Capacities)

63.

Plaintiffs repeat and re-allege each and every allegation of the complaint.

64.

The defendants named in this Count, GAUTREAUX and CITY-PARISH, acting individually and together, under color of law, acted to violate Mr. Johnson's right to be free from cruel and unusual punishment and the right to due process as protected by the Eighth and Fourteenth Amendments of the United States Constitution and 42 USC § 1983.  They did so by establishing and maintaining policies, patterns or practices that they knew would deprive prisoners with serious medical conditions, namely, serious mental health disorders, of treatment for those disorders.  There was furthermore a policy, pattern, and practice of staff members at EBRPP engaging in excessive use of force and verbal and physical abuse of prisoners suffering with mental illness.

65.

Mr. Johnson and the plaintiff were individually harmed by these policies, patterns, or practices because they resulted in the death of Mr. Johnson, who was deprived of appropriate

mental health and medical treatment after he was booked into the EBRPP, and did not receive screening, evaluation and treatment for his acute and severe emotional and mental distress following the ingestion of drugs in the EBRPP, to wit, mojo.  These deprivations resulted in his death, as described above.

66.

At all pertinent times, the defendants named in this Count, individually and collectively, acted unreasonably, recklessly, and with deliberate indifference and disregard for the safety, constitutional, and civil rights of the plaintiffs by establishing the above-described policies, patterns, or practices.

67.

The above-named defendants are therefore liable to the plaintiff for the violation of constitutional rights described above pursuant to *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978).

**COUNT 7 – § 1983 Violation Based on Specific Act or Omission Resulting in Unconstitutional Injury and Death— Defendants  LT. DUPLESSIS, DEPUTY KUJAWA, DEPUTY CANEZARO, CORPORAL BUCKNER, CORPORAL ROBB, SARGENT BROADWAY, and J. DOES #50-99 (Individual Capacities)**

68.

Plaintiffs repeat and re-allege each and every allegation of the complaint.

69.

The defendants named in this Count, DUPLESSIS, DEPUTY KUJAWA, DEPUTY CANEZARO, CORPORAL BUCKNER, CORPORAL ROBB, SARGENT BROADWAY, and J. DOES #50-99, acting individually and together, under color of law, acted to violate Mr. Johnson's right to be free from cruel and unusual punishment and the right to due process as protected by the Eighth and Fourteenth Amendments of the United States Constitution and 42

USC § 1983.  They did so by using excessive force on Mr. Johnson, ignoring his obvious

emotional distress and stated intentions to end his life, placing him in solitary confinement with a

blanket that he could use as a noose to hang himself, failing to monitor him and falsifying

official logbooks to indicate that they did monitor him, and denying him access mental health

care.  These defendants were acting upon the custom within the EBRPP of training and

supervision, or the lack thereof, that authorizes sheriff's deputies to ignore the basic human

needs of prisoners, including Mr. Johnson, in the EBRPP.

70.

Mr. Johnson and the plaintiff were individually harmed by these policies, patterns, or

practices because they resulted in the death of Mr. Johnson, who was deprived of his

constitutional right to have his basic human needs met and to be free from the excessive use of

force.  These deprivations resulted in his death, as described above.

71.

At all pertinent times, the defendants named in this Count, individually and collectively,

acted unreasonably, recklessly, and with deliberate indifference and disregard for the safety,

constitutional, and civil rights of the plaintiffs by establishing the above-described policies,

patterns, or practices.

**COUNT 8 – State Claim of Negligent and/or Intentional Conduct Resulting in Injury and Death— Defendants  LT. DUPLESSIS, DEPUTY KUJAWA, DEPUTY CANEZARO, CORPORAL BUCKNER, CORPORAL ROBB, SARGENT BROADWAY, AND J. DOES #50-99 (Individual Capacities)**

72.

Plaintiffs repeat and re-allege each and every allegation of the complaint.

73.

The above-named defendants, acting individually and together, and under color of law, engaged in a course of conduct and conspired to engage in a course of conduct that caused injury and harm to Mr. Johnson and ultimately led to his death.  At all times pertinent herein, these defendants, individually and collectively, acted intentionally, maliciously, recklessly, and/or negligently towards the deceased, Mr. Johnson.  Furthermore, these defendants, individually and collectively, had the duty and ability to intervene to prevent the tortious conduct of co-defendants toward Mr. Johnson, as described herein, but failed to do so.  They are therefore liable to the plaintiffs, as described herein.

**COUNT 9 – State Claim of Respondeat Superior Liability of Sheriff GAUTREAUX**

74.

Plaintiffs repeat and re-allege each and every allegation of the complaint.

75.

At all relevant times, the individually named defendants were acting in the course and scope of their employment with defendants **GAUTREAUX** and East Baton Rouge Sheriff's Office.  **GAUTREAUX** is therefore liable under the doctrine of *respondeat superior* for the actions and inactions of the individual defendants, as described herein.

**COUNT 10 – Loss of Consortium ALL DEFENDANTS**

76.

Plaintiffs repeat and re-allege each and every allegation of the complaint.

77.

Defendants are liable to LIYAH ALEXANDRIA JOHNSON, pursuant to La. C.C. 2315 (B) through 42 U.S.C. § 1983.  On behalf of the minor, Plaintiff seeks relief under La. C.C. art. 2315(b) on behalf of LIYAH ALEXANDRIA JOHNSON for loss of service, society, support,

love and affection arising out of the injuries occasioned by the acts and/or omissions of the Defendants herein.

### COUNT 11 – Wrongful Death Claim of LIYAH ALEXANDRIA JOHNSON

78.

Plaintiffs repeat and re-allege each and every allegation of the complaint.

79.

LIYAH ALEXANDRIA JOHNSON is a surviving child of LAMAR JOHNSON, who through her court-appointed tutrix, seeks to recover for the damages which she sustained as a result of the death of her father due to the fault of Defendants in that she had a very close, loving supportive relationship with her father.

80.

The deceased left no surviving wife.

### COUNT 12 – Survival Action Claim of LIYAH ALEXANDRIA JOHNSON

83.

Plaintiffs repeat and re-allege each and every allegation of the complaint.

85.

ADRIENNE, on behalf of the minor, seeks relief under La. C.C. art 2315.2, for the pain and suffering occurring before and during Mr. Johnson's death occasioned by the intentional and/or grossly negligent acts and/or omissions of the Defendants herein, and for all other relief as set forth herein.

### COUNT 13 – State Claim of Direct Action Against an Insurer, Pursuant to LA R.S. § 22:1269

86.

Plaintiffs repeat and re-allege each and every allegation of the complaint.

87.

At all applicable times, defendant, COLUMBIA CASUALTY COMPANY, CNA INSURANCE COMPANY afforded liability insurance coverage to defendants GAUTREAUX and/or other defendants.    Accordingly, COLUMBIA CASUALTY COMPANY, CNA INSURANCE COMPANY is liable to the plaintiffs for the intentional and/or negligent acts of the other defendants.

## COUNT 14 – State Claim for Breach of Duty to Provide Medical Treatment (GAUTREAUX)

88.

Plaintiffs repeat and re-allege each and every allegation of the complaint.

89.

Under Louisiana law, GAUTREAUX, as Sheriff and the confining authority, has a legal duty to provide medical treatment for prisoners.

90.

GAUTREAUX failed to provide medical and mental health treatment within EBRPP that was adequate and reasonable as required by law.

91.

Mr. Johnson's death was a direct result of GAUTREAUX's failure to provide adequate and reasonable medical and mental health care.

## V.    INJURIES

As a result of the actions of the defendants as described above, damages have been incurred as follows:

a.    Lamar Johnson (deceased) suffered conscious and severe physical, mental, and emotional distress, pain and suffering prior to his death, and lost his life.

b.      Adrienne Lewis, on behalf of the minor child Liyah Johnson, who is the daughter of Lamar Johnson, suffered emotional pain and suffering, past, present, and future; loss of support; and has suffered the loss of love, affection, and companionship of her father, Lamar Johnson, and has incurred funeral and burial expenses.

## VI.    PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that after due proceedings there be judgment rendered herein in plaintiffs' favor and against all defendants individually and jointly, as follows:

1.      Compensatory and punitive damages as prayed for herein;

2.      Reasonable attorneys' fees, as provided in 42 U.S.C. § 1988, 42 U.S.C. § 12205, and 29 U.S.C. § 794(b) and all costs of these proceedings and legal interest;

3.      Punitive damages pursuant to 42 U.S.C. § 1983 and any other applicable statute;

4.      Relief under La. C.C. arts. 2315 and 2321 from the intentional and/or negligent acts and/or omissions of the Defendants herein; and

5.      All other relief as appears just and proper to this Honorable Court.

RESPECTFULLY SUBMITTED, this 23rd day of September, 2016.

S. WESLEY WOOLF, P.C.

/s/ David J. Utter
DAVID J. UTTER
Louisiana Bar Number: 23236
*Lead Attorney for Plaintiff*

408 East Bay Street
Savannah, Georgia 31401
(912) 201-3696 Telephone
(912) 236-1884 Facsimile
utter@woolflawfirm.net

THE CLAIBORNE FIRM, P.C.

/s/ William R. Claiborne
WILLIAM R. CLAIBORNE
Georgia Bar Number: 126363
*Pro Hac Vice Motion Forthcoming*
*Attorney for Plaintiff*

410 East Bay Street
Savannah, Georgia 31401
(912) 236-9559 Telephone
(912) 236-1884 Facsimile
will@claibornefirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2016 a copy of the foregoing Plaintiff's First Amended Complaint was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent by operation of the court's electronic filing system to all counsel of record.

Savannah, Georgia, this 23rd day of September 2016.

s/ David J. Utter