# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

ADRIENNE LEWIS, by and on behalf of
the minor child, LIYAH ALEXANDRIA
JOHNSON

                                  CIVIL ACTION

v.

                                  NO. 16-352-JWD-RLB

EAST BATON ROUGE PARISH, ET AL.

## RULING AND ORDER

This matter comes before the Court on two motions: (1) the *Motion to Dismiss* (Doc. 32) filed by Defendants, Sheriff Sid J. Gautreaux, III, in his individual and official capacity as Sheriff of East Baton Rouge Parish, Lieutenant Colonel Dennis Grimes, Lieutenant Michael Duplessis, Deputy Avery Kujawa, Deputy Dalton Canezaro, and Corporal Cedric Buckner, (collectively, "Sheriff Defendants"), and (2) *Columbia Casualty Company's Motion to Dismiss and Incorporated Memorandum in Support* (Doc. 55) filed by Defendant Columbia Casualty Company ("Columbia").[1]  Plaintiff Adrienne Lewis, by and on behalf of the minor child Liyah Alexandria Johnson ("Plaintiff") opposes the motions. (Docs. 38, 59.)  Sheriff Defendants have filed a reply. (Doc. 44.)  Oral argument is not necessary.  The Court has carefully considered the law, the facts in the record, and the arguments and the submissions of the parties and is prepared to rule.  For the following reasons, the motions are **GRANTED IN PART** and **DENIED IN PART**.

---

[1] Other defendants in this action include (1) City of Baton Rouge/Parish of East Baton Rouge ("City/Parish") and (2) Corporal Robb and Sargant Broadway.  These Defendants filed separate motions to dismiss (Docs. 45, 48), and the Court issued rulings on these motions. (Docs. 72, 77.)  The instant ruling deals only with the motions to dismiss filed by the Sheriff Defendants and Columbia.

I.      **Factual and Procedural Background[2]**

      **A. Relevant Individuals in the Complaint**

This section provides an overview of the individuals relevant to the instant motion. Lamar Johnson ("Johnson") is the individual who, in May of 2014, committed suicide while incarcerated at East Baton Rouge Parish Prison ("EBRPP"). Johnson's death lies at the heart of this case, and Plaintiff's allegations concerning his demise are discussed extensively below.

      Liyah Alexandria Johnson is Johnson's minor child. (Doc. 27 at 2.) Adrienne Lewis is Liyah Alexandria Johnson's mother and natural tutrix, and Adrienne Lewis brings this action on her daughter's behalf. (Doc. 27 at 2.)

      Sheriff Sid Gautreaux ("Gautreaux" or "Sheriff") is sued in his individual and official capacity as Sheriff of East Baton Rouge Parish. (Doc. 27 at 3.) Plaintiff alleges that, at all relevant times, Gautreaux was "the ultimate policy-maker for the East Baton Rouge Parish Sheriff's Office" ("EBRPSO"), and Gautreaux "was responsible for the hiring, training, supervision, discipline and control of appropriate staff to maintain the care, custody, and control of prisoners in the custody of the [EBRPSO]." (Doc. 27 at 3.) Gautreaux "was responsible for all staffing levels of the EBRPP" as well as for the "supervision, administration, policies, practices, customs, and operations of EBRPP." (Doc. 27 at 3.) The Sheriff "was and is a final policy maker who at times delegated policy making authority to other defendants named in this lawsuit." (Doc. 27 at 3.)

      Lieutenant Colonel Dennis Grimes ("Grimes") "was the Warden of the EBRPP, and as such was responsible for supervision, administration, policies, practices, customs, operations,

---

[2] The following facts are set forth in the Plaintiff's Amended Complaint (Doc. 27). For the purpose of this motion, they are accepted as true and viewed in a light most favorable to the Plaintiff. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502 (5th Cir. 2014) (citing *Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012)).

training of staff, and operation of the EBRPP." (Doc. 27 at 3.)  "[Grimes] was and is a final policy maker who at times delegated policy making authority to other defendants named in this lawsuit." (Doc. 27 at 3.)

Lieutenant Michael Duplessis ("Duplessis") is sued in his individual and official capacity as an EBRPSO employee and as "a supervisor of duties." (Doc. 27 at 4.)  Duplessis is alleged to have been "assigned as a supervisor to posts at the EBRPP in locations where Mr. Johnson was housed." (Doc. 27 at 4.)  Plaintiff alleges:

> [Duplessis] was responsible for ensuring appropriate care, custody, and control occurred, including respecting all prisoners' rights, including those of Mr. Johnson, and for communicating serious medical conditions, including mental health concerns and risks of suicide, of prisoners to appropriate medical staff and/or mental health professionals. He was also responsible for supervising deputies on their shifts to ensure that deputies under his supervision carried out all duties in accordance with their obligations to respect all prisoners' rights.

(Doc. 27 at 4.)  Duplessis is alleged to be a "final policy maker, having been delegated the authority to do so by" Gautreaux and Grimes, but, "[w]hen not acting as a final policy maker, [Duplessis] acted under the direction of" Gautreaux and Grimes. (Doc. 27 at 4.)

Deputy Avery Kujawa ("Kujawa"), Deputy Dalton Canezaro ("Canezaro"), and Corporal Cedric Buckner ("Buckner") are sued in their individual and official capacities as employees of EBRPP.  All were "assigned to posts at the EBRPP in locations where Mr. Johnson was housed". (Doc. 27 at 4–5.)  "All were responsible for ensuring that appropriate care, custody, and control occurred, including respecting Mr. Johnson's rights, and for communicating serious medical conditions, including mental health concerns and risks of suicide, of prisoners to appropriate medical staff and/or mental health professionals." (Doc. 27 at 5.)  Plaintiff claims that all of these defendants were "final policy makers, having been delegated the authority to do so by" Gautreaux and Grimes; when not final policy makers, these defendants acted under the direction

of Gautreaux and Grimes. (Doc. 27 at 5.)  Lastly, according to the Amended Complaint, Buckner

and two other EBRPP employees physically assaulted Johnson. (Doc. 27 at 5.)

Columbia provided Gautreaux and EBRPSO "with a policy of liability insurance for the

acts" alleged in the Complaint. (Doc. 27 at 5–6.)

### B.  Johnson's Death

Plaintiff alleges that, on May 26, 2015, Johnson was arrested after a routine traffic stop

for tinted windows. (Doc. 27 at 6.)  Within an hour, he was booked into EBRPP due to a hold on

Johnson from Jefferson Parish authorities for a four-year-old arrest warrant on a non-violent

charge. (Doc. 27 at 6.)

On May 27, 2015, after time in the central booking portion of EBRPP, Johnson was

moved to Unit I's Q8 dorm. [3] (Doc. 27 at 6.)  Plaintiff alleges that "Q8 is segregated by race and

houses exclusively African-American male prisoners.  Incarcerated individuals in Q8 share a

dayroom and living area with those in Q7," which is "also segregated by race and houses

exclusively African-American male prisoners." (Doc. 27 at 6.)  Plaintiff further asserts:

> EBRPP authorities choose to assign only one to two staff to monitor the combined
> eighty to one hundred prisoners assigned to Q7 and Q8. Guards rarely monitor the
> living areas. Defects in physical design and manner of operation, including
> inadequate staffing, inadequate supervision techniques, and poor sightlines,
> produce frequent violence and a continuous pattern of constitutional deprivations
> for the prisoners assigned to the units, including Mr. Johnson.

(Doc. 27 at 6.)

---

[3] The Amended Complaint actually alleges that this occurred on May 27, 20*16*. (Doc. 27 at 6.)  However, this is
merely a typographical error, as Johnson is alleged to have died in 2015 (Doc. 27 at 11), and this lawsuit was filed
on May 26, 2016. (*See* Doc. 1.)

On May 28, 2015,[4] while in EBRPP, Johnson pled guilty to a Baton Rouge ordinance for not possessing his driver's license in 2009. (Doc. 27 at 7.)  Johnson was sentenced to five (5) days with credit for time served since he entered the jail on May 26. (Doc. 27 at 7.)

Plaintiff alleges that, while in EBRPP, Johnson acquired and consumed synthetic marijuana called "mojo," which was "readily accessible by prisoners at EBRPP." (Doc. 27 at 7.) According to Plaintiff, synthetic marijuana can have "unpredictable and, in some, case, severe or even life-threatening" effects. (Doc. 27 at 7.)  Plaintiff asserts that "Johnson's reaction to mojo was severe"; that "[h]e suffered paranoid delusions and began talking out loud to himself"; and that, though "[h]is extreme emotional distress was apparent to anyone within sight and sound of . . . Johnson, . . . .EBRPP staff ignored Mr. Johnson's serious medical needs." (Doc. 27 at 7.)

Plaintiff claims that, while on Q8, Johnson was physically attacked and pepper sprayed by some of the EBRPP employees, and "possibly Buckner", and this assault "exacerbated Mr. Johnson's condition, making him more paranoid and delusional." (Doc. 27 at 7–8.)  Particularly relevant here, Plaintiff alleges:

> The only official document from EBRPP reflecting Mr. Johnson's experience in Unit I's Q8 dorm is a "disciplinary report" issued by defendant BUCKNER and approved by defendant DUPLESSIS. The report is false and/or omits crucial facts. In his report, BUCKNER fails to accurately reflect Mr. Johnson's emotional distress and instead seeks to punish Mr. Johnson for requesting that he be moved out of Q8.

(Doc. 27 at 8.)

According to "[a]nother official document from EBRPP . . . Johnson was moved to EBRPP's Unit II 'for protection.' " (Doc. 27 at 8.)  Plaintiff alleges that, though there is "no official document" noting that "Johnson was in any emotional distress":

> [A]ccording to interviews with individuals incarcerated with Mr. Johnson, Mr. Johnson was loudly, openly, and clearly in great emotional distress. Individuals

---

[4] Again, while pled May 28, 2016, this is merely a typographical error.

incarcerated with Mr. Johnson who were eyewitnesses describe his condition as paranoid and suicidal, reporting specifically that Mr. Johnson was talking about killing himself, "not wanting to live" and stating he "couldn't take it" anymore.

(Doc. 27 at 8.)

Plaintiff claims that Kujawa and Canezaro and other officials "witnessed Mr. Johnson's extreme emotional distress and suicidal statements but chose to ignore his condition." (Doc. 27 at 8.) These defendants, despite their observations, "failed to follow EBRPP policy by not transporting Mr. Johnson to a mental health or any other health care professional, or otherwise seeking mental health care for Mr. Johnson." (Doc. 27 at 8.) Additionally, "[d]espite the obvious indications that Mr. Johnson was suffering an emotional breakdown, was suicidal, and in acute mental health distress, EBRPP officials failed to perform a mental health assessment of Mr. Johnson." (Doc. 27 at 9.)

Despite his state, Johnson was moved to "Unit II's M01 wing, a row of solitary isolation cells." (Doc. 27 at 9.) "EBRPP deputies, including defendants [Kujawa, Canezaro, and others], use M01 to house mentally ill prisoners as a means to deny such prisoners access to mental health care." (Doc. 27 at 9.) Further, rather than regularly monitor such inmates as they are required to do, Kujawa, Canezaro, and others would "falsely write in the logbook that they ma[d]e their rounds." (Doc. 27 at 9.) "EBRPP guards are supposed to monitor the tier every fifteen (15) to thirty (30) minutes, but rarely do so." (Doc. 27 at 9.)

According to the Amended Complaint, while in this new area, Johnson was assaulted two more times. (Doc. 27 at 10.) Plaintiff alleges that, "[c]onsistent with EBRPP's practice and custom, no logbook entries were made reflecting" the assault, and "no incident report was created reflecting . . . [the] use of force upon Mr. Johnson." (Doc. 27 at 10.)

The Amended Complaint alleges that, though it is unclear from records how long Johnson stayed in solitary, from 7:00 a.m. to 10:10 a.m. on May 30, 2015, some of the Sheriff Defendants (Kujawa and Canezaro) claimed to have made rounds to check on Johnson.  (Doc. 27 at 10–11.)  At 10:22 a.m. that day, "Johnson was found hanging from his cell bars.  Mr. Johnson left EBRPP on a stretcher, brain damaged, but alive.  He died a few days later at a local hospital." (Doc. 27 at 11.)

### C.  Alleged Conditions, Practices, and Customs of EBRPP

Plaintiff alleges: "Interviews with individuals incarcerated with Mr. Johnson report grossly inadequate evaluation, monitoring, and treatment of prisoner's health care at EBRRP." (Doc. 27 at 11.)  According to Plaintiff, "[m]edia reports subsequent to Mr. Johnson's death quote health care professionals noting a 'significant decline in the quality of care . . . over the past six or seven years,' crucial health conditions at the prison, and chronic understaffing." (Doc. 27 at 11.)  Further, "[a] recent independent evaluation of the system called the health care provided to prisoners at EBRPP 'episodic and inconsistent.' " (Doc. 27 at 11.)

Plaintiff describes interviews by persons incarcerated with Johnson, who "report that the general conditions at EBRPP, by any measure, shock the conscience." (Doc. 27 at 11.)  Plaintiff provides the following specific reports:

- Contraband, specifically mojo, is "prevalent," causing some who consumes it to become "crazy" and be placed in the "crazy man cells"—M01. Two individuals incarcerated with Mr. Johnson named the price for a "stick" of mojo: $5.00;

- Some units, specifically A3, A2, F4, F5, and B3, are called the "dungeon" because EBRPP deputies assigned to monitor the units do not do so regularly and falsely log that they make rounds. The result is often unregulated prisoners who resort to "violence what seems like every day;"

- Unit Q7-8 "was a very dangerous place, especially if you did not know anyone. It was like chaos, a lot of gambling, card playing, and fights;"

7

- Health care providers who fail to do their job, and retaliate against prisoners who seek help and safety. One interview with an individual incarcerated with Mr. Johnson reports that, after he suffered a broken jaw after an attack by another prisoner, he sat in the holding tank of the medical unit for hours awaiting transport to the hospital bleeding from his mouth, with nothing for the great pain and only a plastic bag to capture the blood mixed with saliva dripping from his mouth. Once he returned to the facility and was recuperating in the medical unit, he was moved to M01 by a nurse as retaliation for continually insisting that he receive the amount of Ensure prescribed to him each day;

- Arbitrary physical violence by guards, including beating prisoners in the visitation booth because of the absence of cameras, beating prisoners and placing them on lockdown to deny them access to their families until their wounds heal, and guards who witness colleagues beating prisoners and failing to report the assaults.

(Doc. 27 at 12.)

Plaintiff next alleges that, "[c]onsistent with EBRPP's practice and custom," Kujawa, Canezaro, and others failed to take certain actions. Specifically, Plaintiff claims that these defendants "failed to document the locations of prisoners," which "allows, as in Mr. Johnson's case, EBRPP staff to move prisoners around the facilities with no accountability or supervision" (Doc. 27 at 13.)

Further, "[c]onsistent with EBRPP's practice and custom," Kujawa, Canezaro, and others "failed to monitor prisoners living areas, including the isolation cells in Unit II's M01." (Doc. 27 at 13.) Plaintiff explains that, according to people incarcerated with Johnson, "M01 is officially or unofficially designated for prisoners with serious mental health needs and contains at least two cells designated for suicidal prisoners . . . because they are close to the control unit occupied by EBRPP staff," and this proximity is "supposed to allow monitoring of suicidal prisoners without having to physical make monitoring rounds, i.e. walk the hallway in front of the cell." (Doc. 27 at 13.) Plaintiff asserts that Kujawa and Canezaro allowed Johnson to hang himself "by failing to

place Mr. Johnson in cell one or two, and by failing to physically walk the halls to monitor Mr. Johnson's cell even though they had knowledge of his acute emotional distress[.]" (Doc. 27 at 13.)

Moreover, "[c]onsistent with EBRPP's practice and custom," Kurjawa, Canazero, and others "falsely documented that EBRPP staff make regular monitoring rounds to supervise prisoners," and Kujawa, Canezaro, Buckner, Duplessis, and others "failed to provide Mr. Johnson sufficient access to qualified medical and mental health care." (Doc. 27 at 13–14.) Lastly, "[c]onsistent with EBRPP's practice and custom," certain defendants, "and possibly [Buckner], physically assaulted" Johnson, which "exacerbated his mental illness and made it more likely, not less, that he would hurt himself." (Doc. 27 at 14.)

### D.  Claims against Gautreaux and Grimes

According to the Amended Complaint, Gautreaux and Grimes "failed to adequately staff and train employees responsible for providing constitutionally adequate medical and mental health care at EBRPP." (Doc. 27 at 14.)  Plaintiff alleges: "Rather than provide access to mental health care to suicidal and obviously mentally ill prisoners, including Mr. Johnson, defendants [Gautreaux and Grimes] permitted public officials in their employ to place such prisoners in M01, a dangerous, filthy, loud, and unmonitored solitary confinement unit of EBRPP." (Doc. 27 at 14.)

Plaintiff's also claim:

The failures of all defendants are well known and consistent with a pattern and practice resulting in a decrepit physical plant, rampant violence, and deliberate indifference to the basic human needs, including medical and mental health care, of prisoners at EBRPP, including the following examples:

a. Since 2013, at least four people died at the jail due to inadequate medical and mental health care;

b. In February of 2015, defendant GRIMES publically acknowledged that cell doors in the EBRPP do not open and shut due to rust, the layout of the prison makes it difficult to monitor prisoners, and overpopulation requires sending hundreds of prisoners to other parishes;

      c. In October of 2015, a Baton Rouge elected officials complained of a study into the medical care at EBRPP, noting that "the council already knows about numerous problems" including understaffing, medical equipment shortages, and insufficient compensation for medical professionals;

      d. Also in October of 2015, defendant GAUTREAUX was cited as requesting a new jail "for years" and that "officials long ago identified the problem: a dilapidated facility that is ill-equipped to hold . . . mentally ill who are booked";

      e. In February of 2016, a seventeen-year-old boy died at the hands of his cellmate. Even though witnesses could hear the victim cry "I give up," EBRPP staff did not intervene in time to stop the murder.

(Doc. 27 at 15.)

      The Amended Complaint asserts fourteen separate counts, and seven of them are directed at Gautreaux and Grimes.  In Count 1, Plaintiff alleges that Gautreaux and Grimes, in their official capacity, exposed prisoners at EBRPP, including Johnson, "to violent and dangerous conditions of confinement so extensive and pervasive that they reflect a *de facto* policy approved by" Gautreaux and Grimes. (Doc. 27 at 16.)  Count 1 continues:

      Such policies and practices include, but are not limited to, racial segregation of prisoner living areas, defects in physical design and manner of operation, including inadequate staffing, inadequate supervision techniques, poor sightlines, and inadequate monitoring of prisoner living areas that combined to result in frequent violence and a continuous pattern of constitutional deprivations for the prisoners in EBRPP, including Mr. Johnson.

(Doc. 27 at 16.)  Plaintiff claims that Gautreaux and Grimes "knew or should have known that guards engage in illegal conduct including the falsifying of EBRPP monitoring logs, physical abuse of prisoners, and permitting the smuggling of drugs into EBRPP, primarily 'mojo,' synthetic marijuana." (Doc. 27 at 16–17.)  Plaintiff concludes that Gautreaux and Grimes "failed to provide appropriate medical and mental health services to EBRPP prisoners, including Mr.

Johnson, who was individually harmed by the *de facto* policies and practices described above."
(Doc. 27 at 17.)

Count 2 alleges a *Monell* claim for unconstitutional conditions of confinement. (Doc. 27 at 17.)  Plaintiff alleges a violation of Johnson's Eighth and Fourteenth Amendment rights by Gautreaux and Grimes' "maintaining policies, patterns or practices that created unconstitutional conditions of confinement that deprived prisoners, including Mr. Johnson, of basic human needs, including physical safety and mental health care." (Doc. 27 at 17.)  Plaintiff claims that the "policies and practices adopted" by Gautreaux and Grimes, "whether explicit or *de facto* as evidenced by the extended and pervasive misconduct by EBRPPP . . . officials," include the following: "racial segregation of prisoner living areas, defects in physical design and manner of operation, including inadequate staffing, inadequate supervision techniques, poor sightlines, and inadequate monitoring of prisoner living areas." (Doc. 27 at 17–18.)  All of this "combined to result in frequent violence and a continuous pattern of constitutional deprivations for the prisoners in EBRPP, including Mr. Johnson." (Doc. 27 at 18.)  Plaintiff claims that Gautreaux and Grimes "knew or should have known that guards engaged in illegal conduct," and they "failed to provide appropriate medical and mental health services to EBRPP prisoners, including Mr. Johnson," who was harmed by the above "*de facto* policies and practices." (Doc. 27 at 18.) Plaintiff concludes by stating that these defendants "acted unreasonably, recklessly, and with deliberate indifference and disregard for the safety, constitutional, and civil rights of the plaintiffs by establishing the above-described policies, or practices." (Doc. 27 at 18.)

Count 3 claims that Gautreaux violated Johnson's Eighth and Fourteenth Amendment rights by "coordinating with CITY-PARISH's Emergency Medical Services [("EMS")] and Prison Medical Services [("PMS")] to provide inadequate and insufficient services for medical

and mental health care that they knew would result in the deprivation of adequate medical and mental health care for prisoners with . . . serious mental health conditions." (Doc. 27 at 19.) Plaintiff claims she was "harmed by the insufficiency of the contract and the failure to make other accommodations to provide mental health services because they resulted in the death of Mr. Johnson, who was deprived of appropriate mental health and medical treatment[.]" (Doc. 27 at 19.) Plaintiff further alleges deliberate indifference. (Doc. 27 at 19.)

Count 4 alleges a failure to supervise claim against Gautreaux and Grimes. (Doc. 27 at 19.) Specifically, Plaintiff claims that Gautreaux and Grimes "failed to supervise their subordinates, namely" Duplessis, Kujawa, Canezaro, Buckner, and others, "to ensure that these subordinates did not ignore prisoners' requests for medical and/or mental health treatment, fail to refer prisoners needing treatment to appropriate mental health professionals, and/or fail to properly monitor prisoners who report suicidal ideation or show signs of mental health crisis." (Doc. 27 at 19–20.) Plaintiff claims that Gautreaux and Grimes "were aware of the need to supervise their subordinates in order to ensure that they did not violate prisoners' rights," yet they "ignored that need and acted unreasonably and with deliberate indifference and disregard for the safety of Mr. Johnson". (Doc. 27 at 20.)

Count 6 alleges a *Monell* claim in which Gautreaux "establish[ed] and maintain[ed] policies, patterns or practices that [he] knew would deprive prisoners with serious medical conditions, namely, serious mental health disorders, of treatment for those disorders." (Doc. 27 at 21.) Plaintiff also alleges a "policy, pattern, and practice of staff members at EBRPP engaging in excessive use of force and verbal and physical abuse of prisoners suffering with mental illness." (Doc. 27 at 21.) These policies resulted in Johnson's death, as he was denied mental

health and medical treatment and did not receive "screening, evaluation and treatment" for his condition. (Doc. 27 at 21–22.) Plaintiff claims deliberate indifference. (Doc. 27 at 22.)

Counts 9 and 14 close the allegations against the Sheriff. Specifically, Count 9 claims that Gautreaux is liable under the theory of respondeat superior. (Doc. 27 at 24.) Plaintiff asserts that defendants were "acting in the course and scope of their employment" with Gautreaux and EBRPSO. (Doc. 27 at 24.) Count 14 alleges that Gautreaux breached his duty to provide adequate and reasonable medical and mental health treatment under Louisiana state law. (Doc. 27 at 26.)

### E.  Claims against Duplessis, Kujawa, Canezaro, and Buckner

Plaintiff asserts three counts against Duplessis, Kujawa, Canezaro, and Buckner. Specifically, Count 5 alleges Section 1983 claims against these defendants for deliberate indifference and failure to provide appropriate medical and mental health care. Plaintiff alleges that these defendants "had the duty and ability to intervene to prevent the violations of the rights of Mr. Johnson . . . but failed to do so." (Doc. 27 at 21.) Plaintiff claims these defendants "acted as a final policy maker when they placed Mr. Johnson in an inappropriate wing of EBRPP and deprived Mr. Johnson of reasonable and adequate medical and mental health care, having been delegated the authority to do so by" Gautreaux and Grimes. (Doc. 27 at 21.)

Count 7 asserts Section 1983 claims against these defendants for violating Johnson's Eighth and Fourteenth Amendment by committing certain acts. Specifically, Plaintiff alleges:

> They did so [(i.e., violated Johnson's constitutional rights)] by using excessive force on Mr. Johnson, ignoring his obvious emotional distress and stated intentions to end his life, placing him in solitary confinement with a blanket that he could use as a noose to hang himself, failing to monitor him and falsifying official logbooks to indicate that they did monitor him, and denying him access mental health care. These defendants were acting upon the custom within the EBRPP of training and supervision, or the lack thereof, that authorizes sheriff's deputies to ignore the basic human needs of prisoners, including Mr. Johnson, in the EBRPP.

(Doc. 27 at 23.)

Lastly, Count 8 alleges a state law claim against Duplesis, Kujawa, Canezara, Buckner, and others.  Plaintiff claims that these defendants "acted intentionally, maliciously, recklessly, and/or negligently towards the deceased, Mr. Johnson." (Doc. 27 at 24.)  Plaintiff maintains that these defendants "had the duty and ability to intervene to prevent the tortious conduct of co-defendants toward Mr. Johnson . . . but failed to do so." (Doc. 27 at 24.)

### F.  Procedural History

Plaintiff filed suit on May 26, 2016. (Doc. 1.)  On September 2, 2016, the Sheriff Defendants filed their first *Motion to Dismiss*. (Doc. 18.)  On September 23, 2016, Plaintiff filed the Amended Complaint. (Doc. 27.)   On October 3, 2016, the Sheriff Defendants filed their second *Motion to Dismiss* (Doc. 32), which is the instant motion.  On May 17, 2017, the Court ruled in Doc. 70 that, because of the filing of the Amended Complaint, the Court would deny the Sheriff Defendant's first *Motion to Dismiss* (Doc. 18) as moot and without prejudice to the Sheriff Defendant's second *Motion to Dismiss* (Doc. 32).

## II.    Rule 12(b)(6) Standard

In *Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346 (2014), the Supreme Court explained: "Federal pleading rules call for a 'short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." 135 S. Ct. at 346-47 (citation omitted).

Interpreting Rule 8(a) of the Federal Rules of Civil Procedure, the Fifth Circuit has explained:

The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim *does not impose a probability requirement* at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."

*Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 955, 1965 (2007)).

Applying the above case law, the Western District of Louisiana has stated:

Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009)]; *Twombly*, 555 U.S. at 556. This analysis is not substantively different from that set forth in *Lormand*, *supra*, nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of Fed. R. Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. The standard is met by the "reasonable inference" the court must make that, with or without discovery, the facts set forth a plausible claim for relief under a particular theory of law provided that there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim." *Lormand*, 565 F.3d at 257; *Twombly*, 555 U.S. at 556.

*Diamond Servs. Corp. v. Oceanografia, S.A. De C.V.*, No. 10-00177, 2011 WL 938785, at *3 (W.D. La. Feb. 9, 2011).

The Fifth Circuit recently summarized the standard as follows:

We accept all well-pleaded facts as true and view all facts in the light most favorable to the plaintiff. [*Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys,* 675 F.3d 849, 854 (5th Cir.2012) (en banc).] We need not, however, accept the plaintiff's legal conclusions as true. [*Iqbal,* 556 U.S. at 678, 129 S. Ct. 1937.] To survive dismissal, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." [*Twombly,* 550 U.S. at 570, 127 S. Ct. 1955]. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678, 129 S. Ct. 1937. "Our task, then, is to determine whether the plaintiff stated a legally cognizable claim that is plausible, not to

evaluate the plaintiff's likelihood of success." *Covington,* 675 F.3d at 854 (internal quotation marks and citation omitted).

*Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502–03 (5th Cir. 2014).

### III.    Discussion

#### A.  Summary of Ruling

Sheriff Defendants do not seek dismissal of all claims asserted against them.  Rather, they move to dismiss certain specific causes of action.  The Court will begin by briefly summarizing its ruling on these issues.

First, the Court dismisses Plaintiff's § 1983 claims against Duplessis, Kujawa, Canezaro, and Buckner in their official capacity.  Plaintiff has failed to plead or establish that policymaking authority was in fact delegated from the Sheriff to these lower-level employees.  However, the Court will allow Plaintiff to conduct discovery from the Sheriff Defendants to determine if delegation took place, and, if discovery eventually shows that there was delegation, the Court will entertain a motion for leave to amend the complaint to re-assert these claims.

Second, the Court denies the motion to dismiss Plaintiff's § 1983 claim against Duplessis in his individual capacity.  At this time, Plaintiff has sufficiently pled an episodic acts or omission claim against Duplessis, and she has also adequately alleged that Duplessis is not entitled to qualified immunity.  Nevertheless, the Court will defer a final determination of whether Duplessis is entitled to qualified immunity and allow limited discovery as to Duplessis' personal knowledge and personal conduct as it relates to Johnson and the circumstances leading to his death.

Third, the Court denies Sheriff Defendants' motion to dismiss Plaintiff's state law claims against Duplessis.  Just as the Court found that Plaintiff sufficiently pled a deliberate indifference claim against Duplessis, for the same reasons the Court finds that Plaintiff adequately alleged

that Duplessis breached his duty to use reasonable care to protect Johnson from self-inflicted injury.

Fourth, the Court finds that Plaintiff's § 1983 claims against Gautreaux and Grimes in their individual capacity for failure to supervise should be and is dismissed. Plaintiff has failed to specifically plead how Gautreaux and Grimes' supervision was defective or what supervision they should have provided but did not. Plaintiff's claims of inadequate supervision are, on the whole, conclusory and warrant dismissal. Moreover, even if the Plaintiff had pled a constitutional violation, Gautreaux and Grimes would be entitled to qualified immunity for these claims because Plaintiff did not sufficiently allege how Grimes and Gautreaux's conduct in supervising the lower-level defendants was objectively unreasonable in light of clearly established law or that every Sheriff or Warden in their position would know that their conduct was unlawful.

Fifth, though a close call, the Court denies the motion to dismiss Plaintiff's § 1983 claims against Gautreaux and Grimes in their official capacity. The Court finds that the Plaintiff has sufficiently alleged several customs and practices at EBRPP that Gautreaux and Grimes were aware of. Further, the Plaintiff has sufficiently pled that these customs and policies directly caused Johnson's constitutional violations, including both episodic acts or omissions claims and attacks on conditions of confinement under the Eighth and Fourteenth Amendments. Plaintiff has satisfactorily set forth facts that raise a reasonable expectation that discovery will reveal relevant evidence of each element of the claim.

Sixth, the Court grants the motion to dismiss the claims for punitive damages under § 1983 against all Sheriff Defendants in their official capacity. Such damages are not permitted under the law.

Seventh, the Court grants and denies the motion to dismiss the claims against Columbia to the same extent the Sheriff Defendants' motion to dismiss was granted and denied. Columbia is the Sheriff Defendants' insurer, so Columbia's liability is derivative.

### B.  Procedural Issue

Preliminarily, the Court must determine whether it will consider the exhibits attached to the Plaintiff's opposition. (Docs. 38-1–38-6.)  "If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).  "All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.*

Thus, as a general rule, "[i]n determining whether to grant a motion to dismiss, the district court must not go outside the pleadings and must accept all well-pleaded facts as true, viewing those facts most favorably to the plaintiff." *Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003) (citations omitted).  However, there is a limited exception for "documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Id.* (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000)).  The Fifth Circuit has also noted, in applying this exception, the importance of the fact that the opposing party did not object to the consideration of the documents. *See id.* (citing *Collins*, 224 F.3d at 498–98).

Further, as the Fifth Circuit has recently explained, "[i]f the district court does not rely on materials in the record, such as affidavits, it need not convert a motion to dismiss into one for summary judgment." *U.S. ex rel. Long v. GSDMIdea City, L.L.C.*, 798 F.3d 265, 275 (5th Cir. 2015) (citing *Davis v. Bayless*, 70 F.3d 367, 372 n. 3 (5th Cir. 1995). "[T]he mere submission [or service] of extraneous materials does not by itself convert a Rule 12(b)(6) [or 12(c)] motion into

18

a motion for summary judgment." *Id.* (quoting *Finley Lines Joint Protective Bd. v. Norfolk S. Corp.*, 109 F.3d 993, 996 (4th Cir. 1997) (internal quotation marks omitted) (second alteration in original)). A district court, moreover, enjoys broad discretion in deciding whether to treat a motion to dismiss as a motion for summary judgment. *See St. Paul Ins. Co. v. AFIA Worldwide Ins. Co.*, 937 F.2d 274, 280 n. 6 (5th Cir. 1991).

Here, the Defendant objects only to Plaintiff's Ex. C (Doc. 38-2), the affidavit of Linda Franks, Johnson's mother. The Court has reviewed this document and agrees that it was neither referenced in the Amended Complaint nor central to the Plaintiff's claim. Accordingly, the Court will exercise its discretion and not consider this document.

Sheriff Defendants do not, however, object to the other documents submitted by the Plaintiff. These include minutes from the City Court proceeding where Johnson pled guilty and was sentenced (Doc. 38-1), declarations from inmates housed with Johnson about what happened to Johnson and the conditions at EBRPP (Doc. 38-3), newspaper stories about the conditions of EBRPP (Docs. 38-4, 38-5), and the logbooks for EBRPP (Doc. 38-6). Because these documents are not objected to, and because they appear central to or referenced in the Plaintiff's Amended Complaint, the Court finds that it will exercise its discretion, consider these documents, and not convert the instant *Motion to Dismiss* to a motion for summary judgment.

### C.  Section 1983 Claims Against Duplessis, Kujawa, Canezaro, and Buckner in their Official Capacity

#### 1. Parties' Arguments

Sheriff Defendants first seek to dismiss the § 1983 claims against Duplessis, Kujawa, Canezaro, and Buckner in their official capacities. Plaintiff claims these individuals acted as a "final policy maker" to whom authority was delegated by Gautreaux and Grimes, but, according to Sheriff Defendants, Plaintiff has merely alleged that these lower-level defendants acted

wrongfully. The Sheriff Defendants claim that, under Louisiana law, the Sheriff is the chief policy maker, and the Sheriff in his official capacity is the appropriate entity responsible for constitutional violations.

In response, Plaintiff point to a number of affidavits from inmates incarcerated with Johnson who aver a number of misdeeds by those working for Gautreaux and Grimes at EBRPP. Plaintiff claims that "Discovery is needed to clarify who is in fact the final policymaker at EBRPP, and for what specific issues." (Doc. 38 at 7.)

Sheriff Defendants reply by re-urging that the Plaintiff has failed to allege that the deputies were final policy makers. They attempt to distinguish the case relied upon by the Plaintiff and ask that these claims be dismissed with prejudice.

### 2. Analysis

"Although municipalities cannot be held liable under section 1983 by virtue of the doctrine of respondeat superior, they are subject to such liability where official custom or policy is involved in the injury." *O'Quinn v. Manuel*, 773 F.2d 605, 608 (5th Cir. 1985) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S. Ct. 2427, 2433–34, 85 L. Ed. 2d 791 (1985)). Specifically, municipal liability under § 1983 "requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose moving force is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (internal quotation marks omitted) (citing *Monell v. Dep't. of Soc. Servs. of City of New York*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)).

"[W]hether an official has been delegated final policymaking authority is a question of law for the judge, not of fact for the jury." *Gros v. City of Grand Prairie, Tex.*, 181 F.3d 613, 617 (5th Cir. 1999) (citing *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S. Ct. 2702, 105 L.

Ed. 2d 598 (1989)) (vacating district court's granting of summary judgment because "it was error for the district court to analyze whether Chief Crum had been delegated final policymaking authority as a question of fact for the jury. Instead, the district court should have determined whether any such delegation had occurred as a matter of state law."). *But see Bouman v. Block*, 940 F.2d 1211, 1231 (9th Cir. 1991) (remanding case to district court because, in addition to depending on issues of law, "the question whether the Board of Supervisors delegated to the Sheriff's Department the authority to make employment policy decisions involves unresolved issues of fact as well, and the district court made no factual findings with respect to such issues"); *Kujawski v. Bd. of Comm'rs of Bartholomew Cty., Ind.*, 183 F.3d 734, 739 (7th Cir. 1999) (reversing granting of summary judgment because "we believe that there remains a genuine issue of fact as to whether the Board had, as a matter of custom, delegated final policymaking authority to Parker with respect to community corrections employees").  Further, a "district court should . . . determine[] whether any such delegation had occurred as a matter of state law." *Gros*, 181 F.3d at 617.

Nevertheless, "[t]he sources of state law which should be used to discern which municipal officials possess final policymaking authority are 'state and local positive law, as well as "custom or usage" having the force of law.' " *Gros*, 181 F.3d at 616 (quoting *Jett*, 491 U.S. at 737, 109 S. Ct. 2702). Thus, in *Gros*, after explaining that "depositions were available to the district court as potential evidence of municipal customs or usages having the force of state law," the Fifth Circuit stated: "It was thus incumbent upon the district court to consider state and local positive law as well as evidence of the City's customs and usages in determining which City officials or bodies had final policymaking authority over the policies at issue in this case." *Gros*, 181 F.3d at 616.  The Fifth Circuit also noted (without definitively resolving the question):

> The Supreme Court has rejected the principle of a "de facto" policymaker. *See* [*City of St. Louis v. Praprotnik*, 485 U.S. 112, 131, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988)]. Nonetheless, absent a contrary regulation or ordinance, a city council's or city manager's continuous refusal to exercise some theoretical authority to review a municipal official's policy decisions will, at some point, establish the municipal official as the final policymaking authority by custom or usage having the force of state law.

*Gros,* 181 F.3d at 616 n. 2.

Here, the Court finds that Plaintiff has failed to sufficiently allege that Duplessis, Kujawa, Canezaro, and Buckner were delegated policy-making authority so as to support § 1983 claims against them in their official capacity. Here, the only allegations supporting such claims are (1) that Duplessis, Kujawa, Canezaro, and Buckner were "final policy maker[s], having been delegated the authority" by Gautreaux and Grimes (Doc. 27 at 4–5) and (2) that these defendants "acted as a final policy maker when they placed Mr. Johnson in an inappropriate wing of EBRPP and deprived Mr. Johnson of reasonable and adequate medical and mental health care, having been delegated the authority to do so by" Gautreaux and Grimes. (Doc. 27 at 21.)

But the Court finds these allegations vague, unsubstantiated, and conclusory. Plaintiff does not plead any actual facts demonstrating that there was a custom in place having the force of law so as to warrant a finding of delegation.

The inmate declarations do not establish delegation either. These documents do demonstrate certain customs at the prison that were harmful to inmates, such as inadequate medical care and violence against prisoners. These will be discussed extensively below. But Plaintiff does not point to anything in the declarations (either specifically or as a whole) that would warrant a finding that policymaking authority was in fact delegated to these lower-level employees as outlined by *Gros*.

Plaintiff points to *Nagle v. Gusman*, No. 12-1910, 2016 WL 768588, at *8 (E.D. La. Feb. 26, 2016) to support his argument, but the Court finds this case distinguishable.  In *Nagle*, the Court denied summary judgment as to an official capacity claim against a doctor on the grounds that there was a question of fact regarding delegation. *Id.* The sheriff had testified that the medical director "made policies with respect to mental health issues," and the doctor himself had stated that the sheriff "delegated policy-making authority to [him] with respect to medical issues." *Id.*  The district court thus found that the doctor's argument that "he [could not] be held liable in his official capacity because [the] Sheriff . . . [was] the only official policymaker for" the Orleans Parish Prison was "without merit." *Id.* (citing *Jackson v. Ford*, 544 F. App'x 268, 272 (5th Cir. 2013)).

Here, unlike *Nagle*, the Plaintiff points to and alleges no specific statements by Gautreaux, Grimes, or any of these defendants supporting the conclusion that delegation took place.  Again, Plaintiff mere states that there was delegation without providing any underlying facts to warrant this finding.  Without more, the Court concludes that Plaintiff's § 1983 claims against these defendants in their official capacity should be dismissed.

Nevertheless, the Court places two qualifications on this dismissal.  First, the Court finds that the Plaintiff is still entitled to conduct discovery from all of the Sheriff Defendants to determine whether Duplessis, Kujawa, Canezaro, and Buckner were in fact delegated any policy-making authority.  The Court took this approach in ruling on the motion to dismiss Corporal Robb and Sargant Broadway based on the above case law (*See* Doc. 72), and the same result is warranted here.

Second, if discovery reveals that Duplessis, Kujawa, Canezaro, and Buckner were in fact delegated policy-making authority, the Court will likely grant Plaintiff leave to amend his

complaint to assert § 1983 claims against them in their official capacity. *See Brazier v. Great Atlantic & Pacific Tea Co.*, 256 F.2d 96, 99 (5th Cir. 1958) (stating that, regardless of whether the district court states in the judgment that the dismissal was with or without prejudice, this did not change the rights that the plaintiff had to bring a new action "if new facts should be discovered"); 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2373 (3d ed. 2017) ("Some courts have held that if new facts come to the attention of someone who has been dismissed under Rule 41(b), or that person alleges new facts for the first time, and it was the absence of these facts that made the first complaint defective, the earlier dismissal will not bar a second action.").

Accordingly, the § 1983 claims against Duplessis, Kujawa, Canezaro, and Buckner in their official capacity are dismissed, subject to the two qualifications identified above. Nevertheless, Plaintiff will be given leave to amend to cure the deficiencies of the complaint, if she can do so.

### D. Section 1983 Claim Against Duplessis in his Individual Capacity

#### 1. Parties' Arguments

Sheriff Defendants next argue that Plaintiff has failed to allege that Duplessis is not entitled to qualified immunity. Sheriff Defendants argue that, though Plaintiff alleges that Duplessis supervised others, there is no allegation that Duplessis "heard Mr. Johnson express any thoughts of killing himself" or that he was otherwise "personally involved in the care of" Johnson "in any way while he was . . . incarcerated at the EBRPP." (Doc. 32-1 at 9.) According to Sheriff Defendants, Plaintiff has not shown that Duplessis violated any of Johnson's constitutional rights, much less clearly established ones, and a reasonable official in Duplessis' position would not have understood he was violating Johnson's rights. Thus, Duplessis is entitled to qualified immunity.

Plaintiff responds that the Sheriff Defendants read the allegations against Duplessis too narrowly. Plaintiff claims that he has established a violation of clearly established rights—specifically, the "right to jail conditions that do not segregate prisoners by race, a right to due process before being placed in solitary confinement, and 'a right to be protected from the constant threat of violence.' " (Doc. 38 at 7 (citation omitted).) Plaintiff argues that she "alleges that EBRPP is a violent, dangerous jail where inmates, including Mr. Johnson, are exposed to random violence, powerful and dangerous drugs, arbitrary punishment, and little to no supervision." (Doc. 38 at 7.) Plaintiff points to her allegation that Duplessis "approved . . . [the] . . . false [discipline report]" that put Johnson in isolation and ignored is obvious condition. (Doc. 38 at 8 (quoting Doc. 27).) Plaintiff also points to EBRPP documents showing that Johnson "was the ranking deputy the night Mr. Johnson was removed from the racially segregated Q8 dorm," and, unless Duplessis falsified the logbook, "he made rounds of Q7-8, and two hours and twenty-one minutes later, approved Johnson's move to 'Unit 2 tank for Protection.' " (Doc. 38 at 8.) Plaintiff claims that discovery is needed to show "what Lt. Duplessis knew and when he knew it," and the Court should defer ruling on qualified immunity at this time. (Doc. 38 at 8.)

Sheriff Defendants reply that the only allegation against Duplessis is that he approved a disciplinary report prepared by Buckner concerning Johnson, which Plaintiff claims was false and/or omitted critical facts. Plaintiff alleges that the report failed to accurately show Johnson's emotional distress and was intended to punish Johnson. But, Sheriff Defendants argue, Plaintiff has not shown what clearly established constitutional right Duplessis violated. Discovery is only allowed if the Court unable to rule on the immunity issue without the clarification of facts and the Plaintiff asserts facts which, if true, would defeat qualified immunity. Sheriff Defendants contend that Plaintiff has not shown that Plaintiff violated a clearly established right of Johnson.

25

### 2. Analysis

"A public official is entitled to qualified immunity unless the plaintiff demonstrates that (1) the defendant violated the plaintiff's constitutional rights and (2) the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation." *Hinojosa v. Livingston*, 807 F.3d 657, 669 (5th Cir. 2015) (quoting *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011). The Court will examine each of these in turn.

### a. Constitutional Violations

In *Cleveland v. Gautreaux*, 198 F. Supp. 3d 717 (M.D. La. 2016), this Court provided the relevant standard for Plaintiff's claims against Duplessis under the Fourteenth Amendment:

> "[W]here the complained-of harm is a particular act or omission of one or more officials, the action is characterized properly as an episodic act or omission case." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (internal quotation marks omitted). The relevant question now "becomes whether that official breached his constitutional duty to tend to the basic human needs of persons in his charge, and intentionality is no longer presumed." [*Reed v. Wichita Cnty. (Estate of Henson )*, 795 F.3d 456, 463 (5th Cir. 2015)] (internal quotation marks omitted) (citing [*Hare v. City of Corinth*, 74 F.3d 633, 645 (5th Cir. 1996) (hereinafter, *Hare II*)].). For such a violation to be found, the official must have "subjective knowledge of a substantial risk of serious harm to the detainee and responded to that risk with deliberate indifference." *Hare [II]*, 74 F.3d at 650. Generally, "[d]eliberate indifference is shown when the official knows of and disregards an excessive risk to inmate health or safety," and "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." [*Reed v. Krajca (Estate of Henson )*, 440 F. App'x 341, 343 (5th Cir. 2011).]. . . [D]eliberate indifference . . . exist[s] "where a plaintiff shows that officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985) (internal quotation marks omitted).

*Id.* at 734–35. This Fourteenth Amendment standard for pretrial detainees mirrors the test for episodic acts or omissions claims by inmates under the Eighth Amendment. *See Cleveland*, 198 F. Supp. 3d at 734 n. 11; *see also Thomas v. Mills*, 614 F. App'x 777, 778 (5th Cir. 2015)

(observing that "the deliberate indifference standard articulated by the Supreme Court in *Farmer v. Brennan* . . . applies to pretrial detainees and convicted prisoners alike" (citations omitted)).

The Court notes that it will apply the above standard to Plaintiff's Fourteenth Amendment claims, even after the recent decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015). In *Kingsley*, the Supreme Court held that, in excessive force claims brought under the Fourteenth Amendment, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.*, 135 S. Ct. at 2473.

One circuit has broadly interpreted *Kingsley* to apply not only to excessive force claims but also to failure to protect claims. *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc), *cert. denied sub nom. Los Angeles Cty., Cal. v. Castro*, 137 S. Ct. 831, 197 L. Ed. 2d 69 (2017) ("On balance, we are persuaded that *Kingsley* applies, as well, to failure-to-protect claims brought by pretrial detainees against individual defendants under the Fourteenth Amendment."). *Castro* established the following rule in the Ninth Circuit:

> [T]he elements of a pretrial detainee's Fourteenth Amendment failure-to-protect claim against an individual officer are:
>
> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
>
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
>
> (4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* at 1071.

However, the Fifth Circuit has taken two actions which lead this Court to conclude that it should apply a subjective deliberate indifference standard, even to pretrial detainees. First, in

*Alderson v. Concordia Parish Correctional Facility*, 848 F.3d 415 (5th Cir. 2017) (per curiam), the Fifth Circuit relied upon *Hare II* and applied the subjective standard. *Id.* at 419. A concurring judge cited *Castro* and stated that, in light of it and *Kingsley*, he would "revisit the deliberate indifference standard[.]" *Alderson*, 848 F.3d at 425 (Graves, J., concurring). However, the per curiam opinion specifically rejected this, stating:

> The concurring opinion suggests that our *en banc* court should reconsider *Hare [II]* in light of the Supreme Court's opinion in *Kingsley* [(citation omitted)]. Because the Fifth Circuit has continued to rely on *Hare* [*II*] and to apply a subjective standard post-*Kingsley*, this panel is bound by our rule of orderliness. *See Estate of Henson v. Wichita Cty.*, 795 F.3d 456 (5th Cir. 2015); *see also Hyatt v. Thomas*, 843 F.3d 172 (5th Cir. 2016); *Zimmerman v. Cutler*, 657 Fed. Appx. 340 (5th Cir. 2016). Moreover, the Ninth Circuit is the only circuit to have extended *Kingsley*'s objective standard to failure-to-protect claims. *See Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).

*Id.* at 419 n. 4.

Second, in October of 2016, the Fifth Circuit revised its pattern jury instructions for civil suits. *See* Fifth Circuit Pattern Jury Instructions (Civil Cases) (2016). The Fifth Circuit specifically addressed *Kingsley* by creating a new instruction for excessive force cases under the Fourteenth Amendment. *See id* at 10.7A n. 1, 10.7B. Yet no such *Kingsley*-related change was made to the episodic acts or omissions instruction. *Compare id.* at 10.7B, *with id.* at 10.11.

Given *Alderson* and the pattern charges, the Court believes that it should apply the subjective deliberate indifference standard to Plaintiff's Fourteenth Amendment episodic act or omission claims. The Court is bound to do so until the Fifth Circuit instructions otherwise.

Returning to that subjective standard, the Fifth Circuit has noted the following with respect to evaluating deliberate indifference:

> "[W]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." [*Farmer v. Brennan*, 511 U.S. 825, 842, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)] (internal

citation omitted). For instance, "if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Id.* at 842–43, 114 S. Ct. 1970 (internal quotation marks omitted).

*Hinojosa v. Livingston*, 807 F.3d 657, 665 (5th Cir. 2015)

Here, the Court finds that the Plaintiff has sufficiently pled Eighth and Fourteenth Amendment episodic acts or omission claims against Duplessis.[5]  According to the Amended Complaint, Duplessis was the supervisor "responsible for ensuring appropriate care" of inmates and "for communicating serious medical conditions, including mental health concerns and risks of suicide, of prisoners to appropriate medical staff and/or mental health professionals." (Doc. 27 at 4.)  Plaintiff further alleges that:

> The only official document from EBRPP reflecting Mr. Johnson's experience in Unit I's Q8 dorm is a "disciplinary report" issued by defendant BUCKNER and approved by defendant DUPLESSIS. The report is false and/or omits crucial facts. In his report, BUCKNER fails to accurately reflect Mr. Johnson's emotional distress and instead seeks to punish Mr. Johnson for requesting that he be moved out of Q8.

(Doc. 27 at 8.)  This assertion indicates that Duplessis was aware of Johnson's condition when he approved of the falsified report, a conclusion supported by the later allegation that Duplessis and the other Sheriff Defendants "failed to provide Mr. Johnson sufficient access to qualified medical and mental health care." (Doc. 27 at 13–14.)

---

[5] The other type of claim—one attacking the conditions of confinement—is discussed extensively below with respect to the § 1983 claims against Sheriff Gautreaux and Grimes in their official capacity.  Plaintiff here appears to argue for a condition of confinement claim against Duplessis in his individual capacity, but "[t]hough not expressly, '[t]he Fifth Circuit has at least suggested that condition-of-confinement claims are cognizable against individual actors only in their official capacities.' *Cleveland*, 198 F. Supp. 3d at 734 (quoting *Nagle*, 2016 WL 768588, at *5 (collecting cases)).  Ultimately, given the Court's finding that a condition of confinement claim was stated against Gautreaux and Grimes in their official capacity, this appears to be a non-issue.

Perhaps most convincing, Count 7 of the Amended Complaint specifically claims that Duplessis and others violated Plaintiff's Eighth and Fourteenth Amendment rights by committing certain specific acts. Plaintiff alleges in detail:

> They did so [(i.e., violated Johnson's constitutional rights)] by using excessive force on Mr. Johnson, *ignoring his obvious emotional distress and stated intentions to end his life, placing him in solitary confinement with a blanket that he could use as a noose to hang himself, failing to monitor him and falsifying official logbooks to indicate that they did monitor him, and denying him access mental health care.* These defendants were acting upon the custom within the EBRPP of training and supervision, or the lack thereof, that authorizes sheriff's deputies to ignore the basic human needs of prisoners, including Mr. Johnson, in the EBRPP.

(Doc. 27 at 23 (emphasis added).)

Lastly, the documentary evidence submitted by Plaintiff, which Defendant concedes was referenced in and essential to the Amended Complaint, bolsters this conclusion. The EBRPP logbook reflects that, at 12:50 a.m. on May 28, 2015, Duplessis "made rounds," and, at 3:11 a.m., Johnson was "moved to Unit Z tank for Protection." (Doc. 38-6 at 13.) This was, according to the Amended Complaint, two days before Johnson's death.

All of this demonstrates that Duplessis knew of the obvious, substantial risk that Johnson faced yet disregarded that risk so as to render him deliberately indifferent. Through the Amended Complaint and prison records, Plaintiff has adequately pled that Duplessis "ignored [Johnson's] complaints. . . [and] engaged in . . . conduct that would clearly evince a wanton disregard for any serious medical needs." *Cleveland*, 198 F. Supp. 3d at 735 (quoting *Johnson*, 759 F.2d at 1238). Accordingly, the Court finds that Plaintiff has sufficiently stated that Duplessis violated Johnson's Eighth and Fourteenth Amendment rights.

### b. Qualified Immunity

This leads to the second prong of the qualified immunity analysis. Again, the plaintiff must establish that the "defendant's actions were objectively unreasonable in light of clearly

established law at the time of the violation." *Hinojosa*, 807 F.3d at 669 (quoting *Porter*, 659 F.3d at 445). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.' " *Id.* (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149 (2011)).

It is clearly established law in the Fifth Circuit that "officials will only be liable for episodic acts or omissions resulting in the violation of a detainee's clearly established constitutional rights if they 'had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk.' " *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 393–94 (5th Cir. 2000) (quoting *Hare II*, 74 F.3d at 650); *see also Flores v. County of Hardeman,* 124 F.3d 736, 738 (5th Cir. 1997) ("A detainee's right to adequate protection from known suicidal tendencies was clearly established when Flores committed suicide in January 1990."). Here, the Court must "determine whether, in light of the facts as viewed in the light most favorable to [Plaintiff], the conduct of the individual defendant[] was objectively unreasonable when applied against the deliberate indifference standard." *Id.* at 394 (citing *Hare v. City of Corinth, Miss.*, 135 F.3d 320, 327 (5th Cir. 1998) (hereinafter, "*Hare III*"). The Fifth Circuit has elaborated:

> The case law from our own and from our sister circuits offers little guidance for determining whether the defendants' particular actions toward [a suicide victim] were objectively unreasonable in light of their duty not to act with deliberate indifference toward a known suicide risk. In *Hare III*, we noted that " 'while . . . the law is clearly established that jailers must take measures to prevent inmate suicides once they know of the suicide risk, we cannot say that the law is established with any clarity as to what those measures must be.' " *Hare III*, 135 F.3d at 328–29 (quoting *Rellergert v. Cape Girardeau County*, 924 F.2d 794, 797 (8th Cir. 1991)). It is well-settled, however, "that *negligent* inaction by a jail officer does not violate the due process rights of a person lawfully held in custody of the State." *Hare II,* 74 F.3d at 645 (citing *Davidson v. Cannon*, 474 U.S. 344, 348, 106 S. Ct. 668, 671, 88 L.Ed.2d 677 (1986)) (emphasis supplied). Accordingly, to be

considered deliberately indifferent to a known suicide risk, an officer's acts must constitute at least more than a mere "oversight." *See* [*Lemoine v. New Horizons Ranch and Center, Inc.*, 174 F.3d 629, 635 (5th Cir.1999)] (noting that "oversight" in administration at juvenile behavior modification camp where deceased plaintiff died of heatstroke was not sufficient to demonstrate anything more than negligence and therefore qualified immunity was appropriate). Indeed, to defeat qualified immunity, the plaintiffs must establish that the officers in this case were aware of a substantial and significant risk that [the decedent] might kill herself, but effectively disregarded it. *See Farmer v. Brennan,* 511 U.S. 825, 846–48, 114 S. Ct. 1970, 1984, 128 L.Ed.2d 811 (1994).

*Jacobs*, 228 F.3d at 393–95.

Here, the Court finds that Plaintiff has shown that Duplessis is not entitled to qualified immunity at this time.  The Court need not repeat all of the allegations outlined above but will simply emphasize (1) Duplessis' knowledge of Plaintiff's condition, which can be inferred from the purportedly falsified disciplinary report and the logbooks showing he made rounds on the critical days leading up to Johnson's death, and (2) the allegations in Count 7 that Duplessis and others "ignor[ed] [Johnson's] obvious emotional distress and stated intentions to end his life, plac[ed] him in solitary confinement with a blanket that he could use as a noose to hang himself, fail[ed] to monitor him and falsif[ied] official logbooks to indicate that they did monitor him, and den[ied] him access mental health care." (Doc. 27 at 23.)   Taken together, all of these allegations demonstrate that every reasonable officer in Duplessis' position would know that it was a violation of clearly established law to leave Johnson with a blanket given his known and obvious extreme emotional distress and stated intention to commit suicide.  Thus, as alleged, Duplessis' actions were objectively unreasonable, and the Court finds that Plaintiff has sufficiently rebutted the defense of qualified immunity at this time.

### c.  Discovery

The last question is whether the Court should defer ruling on qualified immunity pending discovery.  In *Hinojosa v. Livingston*, 807 F.3d 657 (5th Cir. 2015), the Fifth Circuit described

the circumstances under which a district court can defer ruling on the issue of qualified immunity and allow discovery. The Fifth Circuit specifically stated:

> "[T]his court has established a careful procedure under which a district court may defer its qualified immunity ruling if further factual development is necessary to ascertain the availability of that defense." [*Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012)]. First, the district court must determine "that the plaintiff's pleadings assert facts which, if true, would overcome the defense of qualified immunity." *Id.* (quoting *Wicks v. Miss. State Emp't Servs.,* 41 F.3d 991, 994 (5th Cir. 1995)). "Thus, a plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." *Id.* When reviewing a complaint that meets this standard, the district court may defer its qualified immunity ruling and order limited discovery if "the court remains 'unable to rule on the immunity defense without further clarification of the facts.' " *Id.* (quoting *Lion Boulos v. Wilson,* 834 F.2d 504, 507 (5th Cir.1987)). Such a discovery order must be "narrowly tailored to uncover only those facts needed to rule on the immunity claim." *Id.* (quoting *Lion Boulos,* 834 F.2d at 507–08).

*Hinojosa*, 807 F.3d at 664.

Thus, in *Hinojosa*, where the Plaintiff alleged that the death of her son (an inmate with hypertension, diabetes, depression, and schizophrenia) was caused by prison officials' deliberate indifference to "dangerous heat conditions," the Fifth Circuit found that the district court "complie[d] with [its] precedent" in allowing limited discovery on the Defendant's knowledge before ruling on the issue of qualified immunity. *Id.* at 673–75. The Fifth Circuit first found that Plaintiff made allegations which, "if true, would establish that Defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . also dr[ew] the inference," when combined with the "open and obvious nature of the dangerously hot conditions," which "would also support an inference of deliberate indifference." *Id.* at 666–67. The Plaintiff also pled allegations which, if true, would "defeat a qualified immunity defense." *Id.* at 670. Nevertheless, the district court found that further factual development was necessary before ruling on qualified immunity and ordered discovery "limited to the personal

33

knowledge and personal conduct of each Defendant as it relates to [decedent] and the circumstances leading to his death." *Id.* at 672.[6]

Here, the Court agrees with Plaintiff that, though Plaintiff has overcome the defense of qualified immunity for purposes of the Rule 12(b)(6) motion, further discovery is needed on the limited issue of the "personal knowledge and personal conduct of [Duplessis] as it relates to [Johnson] and the circumstances leading to his death." *Id.* Accordingly, the Court will defer ruling on the issue of qualified immunity with respect to Duplesssis, pending discovery.

### E. State Law Claim Against Duplessis

Sheriff Defendants also seek dismissal of the state law claims against Duplessis. They claim that Plaintiff has not alleged facts showing that Duplessis knew or should have known of Johnson's suicidal intentions and that preventing Johnson's suicide was not within the duty Duplessis owed to him.

Plaintiff responds with a single statement that the state-law claims against Duplessis should not be dismissed. She does not elaborate further.

The Court rejects the Sheriff Defendant's argument. Under Louisiana law, "prison authorities owe a duty to use reasonable care to protect inmates from harm and that this duty extends to protecting inmates from self-inflicted injury. This duty is not absolute, but depends

---

[6] The district court further explained:

> Such discovery may include Defendants' knowledge of extreme temperatures at the Garza West Unit, including knowledge of any prisoner complaints to prison officials about the temperature in the dorms or cells for the months of May through September for the years of 2010, 2011, and 2012. Plaintiff may inquire as to each Defendant's personal knowledge, if any, in regards to the effects of extreme heat on pre-existing medical conditions of hypertension, diabetes, depression, and schizophrenia, whether Defendants are familiar with the medications generally prescribed to treat such conditions, and whether Defendants have knowledge or training concerning medications and extreme heat. Plaintiff may inquire as to any policies and procedures in place at the Garza West Unit, as well as TDCJ system-wide policies or procedures, adopted or in place to address prison operations when temperatures are considered to constitute extreme heat.

*Hinojosa*, 807 F.3d at 672.

upon the circumstances of the particular case." *Misenheimer v. W. Baton Rouge Par. Sheriff's Office*, 95-2427 (La. App. 1 Cir. 6/28/96); 677 So. 2d 159, 161 (quoting *Scott v. State*, 618 So. 2d 1053 (La. App. 1 Cir. 1993)).

The Court finds that Plaintiff has stated a cognizable claim against Duplessis under Louisiana state law. As demonstrated in the above deliberate indifference analysis, Plaintiff has alleged that Duplessis knew of a substantial risk of harm faced by Johnson yet disregarded that risk. As a result, Plaintiff has sufficiently pled that Duplessis breached the duty he owed to Johnson to prevent Johnson from harming himself, so Sheriff Defendants' motion on this issue is denied.

### F. Section 1983 Claims Against Sheriff Gautreaux and Warden Grimes for Failure to Supervise

#### 1. Parties' Arguments

##### a. Sheriff Defendants' Original Brief

Sheriff Defendants assert that the Plaintiff has failed to allege any facts supporting a claim for supervisory liability, "but instead relies upon conclusory statements insufficient to state a valid claim." (Doc. 32-1 at 11.) Sheriff Defendants argue that the Plaintiff "must point with some specificity to an inadequacy in the supervision decisions" and "must allege with specificity how Sheriff Gautreaux and Warden Grimes['] supervision was defective." (Doc. 32-1 at 11.) Sheriff Defendants state that Plaintiff does not allege how Grimes and Gautreaux's supervision was defective, and she "alleges no facts about what training or supervision Warden Grimes or Sheriff Gautreaux provided or failed to provide." (Doc. 32-1 at 12.)

Sheriff Defendants also contend that Plaintiff does not properly claim deliberate indifference. Sheriff Defendants state:

> Plaintiff does not allege any specific facts that show that either Sheriff Gautreaux or Warden Grimes was aware that any guard had ignored a prisoner's request for medical and/or mental health treatment, had failed to refer prisoners needing treatment to appropriate mental health professionals, and/or had failed to properly monitor prisoners' who report suicidal ideation or show signs of mental health crisis

(Doc. 32-1 at 12.)

Lastly, Sheriff Defendants argue that Gautreaux and Grimes are entitled to qualified immunity. According to Sheriff Defendants, Plaintiff fails to allege how Gautreaux and Grimes' "conduct in supervising prison employees was objectively unreasonable in light of clearly established law at the time of the violation." (Doc. 32-1 at 13.)

### b. Plaintiff's Opposition

Plaintiff responds that, under Fifth Circuit case law, deliberate indifference can be demonstrated "by evidence of circumstances that 'suggest that the defendant-official being sued had been exposed to information concerning the risk [of serious harm to inmates] and thus 'must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.' " (Doc. 38 at 8 (quoting *Hinojosa*, 807 F.3d at 665),)

Plaintiff also claims Grimes and Gautreaux are not entitled to qualified immunity, as Plaintiff has pled (and has provided evidence) that EBRPP "is a violent, dangerous jail that violated Mr. Johnson's constitutional right to relative safety and access to mental health care. (Doc. 38 at 9.) Plaintiff states that, since 2015, Gautreaux and Grimes have discussed the need for a new jail, tacitly acknowledging the problems in the old jail. Plaintiff states that she has sufficiently stated a claim and that, at a minimum, discovery should be granted as to what Defendants knew about the conditions of the jail and when they knew about it.

### c. Sheriff Defendants' Reply

Sheriff Defendants reply that Plaintiff has not argued the first two requirements for liability for failure to supervise. That is, Plaintiff has made no showing that the supervision was defective or that a causal link existed between the failure to supervise and the violation of Johnson's rights. Further, Plaintiff has not shown that the failure to supervise amounted to deliberate indifference. Sheriff Defendants argue that *Hinojosa* was a conditions of confinement case, not a failure to supervise case.

Lastly, Sheriff Defendants argue that Plaintiff has not alleged how Gautreaux and Grimes' "*conduct in supervising prison employees* was objectively unreasonable in light of clearly established law at the time of the violation." (Doc. 44 at 6 (emphasis in original).) Thus, Plaintiff has failed to allege facts which, if true, would overcome Grimes and Gautreaux's qualified immunity.

### 2. Analysis

"A supervisory official may be held liable . . . only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (quoting *Gates v. Texas Dep't of Prot. & Reg. Servs.,* 537 F.3d 404, 435 (5th Cir. 2008)). "In order to establish supervisor liability for constitutional violations committed by subordinate employees, plaintiffs must show that the supervisor act[ed], or fail[ed] to act, with *deliberate indifference* to violations of others' constitutional rights committed by their subordinates." *Id.* (quoting *Gates*, 537 F.3d at 435).

"A supervisor may also be liable for failure to supervise or train if: "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the

failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Porter*, 659 F.3d at 446 (quoting *Goodman v. Harris Cty.,* 571 F.3d 388, 395 (5th Cir. 2009)).

" '[D]eliberate indifference' is a stringent standard of fault, requiring proof [(or, here, allegations)] that a municipal actor disregarded a known or obvious consequence of his action." *Id.* at 446–47 (quoting *Connick v. Thompson,* 563 U.S. 51, 61, 131 S. Ct. 1350, 1360, 179 L. Ed. 2d 417 (2011)). That is, "[d]eliberate indifference is a ' "conscious" choice to endanger constitutional rights.' " *Mesa v. Prejean*, 543 F.3d 264, 274 (5th Cir. 2008) (quoting *Snyder v. Trepagnier*, 142 F.3d 791, 799 (5th Cir. 1998)). "[P]roof of deliberate indifference generally requires a showing of more than a single instance of the lack of training or supervision causing a violation of constitutional rights." *Id.* (quoting *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003)).[7]

Here, the Court finds that the failure to supervise claims warrant dismissal. The Court agrees with the Sheriff Defendants that Plaintiff did not address or argue the first or second element of the failure to supervise analysis. This is precisely where Plaintiff's claim fails.

---

[7] As explained by the Fifth Circuit in the failure to train context:

> To establish that a state actor disregarded a known or obvious consequence of his actions, there must be actual or constructive notice that a particular omission in their training program causes . . . employees to violate citizens' constitutional rights and the actor nevertheless chooses to retain that program. A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference, because without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights. Without cabining failure-to-train claims in this manner . . . , a standard less stringent than deliberate indifference would be employed, and a failure-to-train claim would result in *de facto respondeat superior* liability.

*Porter*, 659 F.3d at 447 (citations, quotations, and alterations omitted).

Plaintiff's sole allegations about the failure to supervise come from Count 4 of the Amended Complaint. Plaintiff claims that Gautreaux and Grimes "failed to supervise their subordinates, namely" Duplessis, Kujawa, Canezaro, Buckner, and others, "to ensure that these subordinates did not ignore prisoners' requests for medical and/or mental health treatment, fail to refer prisoners needing treatment to appropriate mental health professionals, and/or fail to properly monitor prisoners who report suicidal ideation or show signs of mental health crisis." (Doc. 27 at 19–20). While the Plaintiff has alleged the *results* of the Sheriff and Warden's failure to supervise, Plaintiff has not specifically pled how their supervision was defective or what supervision they should have provided but did not.

Critically, in the context of analogous failure to train claims, the Fifth Circuit has said: " 'for a supervisor to be liable . . . , the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform." *Goodman v. Harris Cty*., 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir.2005)). "Moreover, 'for liability to attach based on an "inadequate training" claim, a plaintiff must allege with specificity how a particular training program is defective.' " *Id.* (quoting *Roberts*, 397 F.3d at 293) (dismissing failure to supervise and failure to train claims together).

The same reasoning applies here. Plaintiff has not pled how the supervision of Johnson and other inmates was defective. Plaintiff has failed to specifically allege what the Sheriff and Warden's supervision should have entailed but did not. Plaintiff's claims of inadequate supervision are, on the whole, conclusory. Without more, the Court finds that the Plaintiff has failed to satisfy the requirements for a failure to supervise claim.

Additionally, even if Plaintiff had satisfied the elements of such a claim, the Court also agrees with the Sheriff Defendants that the Plaintiff failed to establish that Grimes and Gautreaux are not entitled to qualified immunity.  As the Sheriff Defendants asserted, Plaintiff has failed to show with any specificity how Grimes and Gautreaux's conduct in supervising the lower-level defendants was objectively unreasonable in light of clearly established law.  That is to say, Plaintiff has not shown how every Sheriff or Warden would know that such conduct was unlawful.  Again, without more, the Plaintiff cannot prevail on this claim.

Accordingly, Sheriff Defendants' motion to dismiss on this issue is granted, and Plaintiff's claims against Gautreaux and Grimes for failure to supervise are dismissed with prejudice.  Nevertheless, the Court will grant Plaintiff leave to amend to cure the deficiencies in the Amended Complaint, if, in good faith, she can do so.

### G. Section 1983 Claims Against Gautreaux and Grimes in their Official Capacity

#### 1. Parties' Arguments

##### a. Sheriff Defendants' Original Brief

Sheriff Defendants maintain that the Plaintiff has failed to assert claims against Gautreaux and Grimes in their official capacity.  Sheriff Defendants argue that, under Fifth Circuit case law, inmate suicide cases are episodic acts or omission claims, not condition or confinement claims.

Sheriff Defendants also contend that Plaintiff has not stated a claim against Gautreaux and Grimes in their official capacities for an episodic act or omission.  They say that Plaintiff has not shown that the deputies at the prison "acted with deliberate indifference to a known suicidal risk *in accordance with an official policy or custom of the Sheriff's Office*." (Doc. 32-1 at 14 (citing *Flores*, supra, at 738).)  Further, according to Sheriff Defendants, Plaintiff has not shown

that an unconstitutional policy or custom that Gautreaux and Grimes knew or should have known would result in the risk of inmate suicide was the moving force behind Johnson's death.

As to the requirement of a policy, Sheriff Defendants contend that Plaintiff points to "de facto" policies and practices of "racial segregation of prisoner living areas, defects in physical design and manner of operation, including inadequate staffing, inadequate supervision techniques, poor sightlines, and inadequate monitoring of prisoner living areas." (Doc. 32-1 at 16.)  Plaintiff also allege that Gautreaux and Grimes knew or should have known that guards falsified EBRPP monitoring logs, physically abused prisoners, and permitted the smuggling of drugs into EBRPP.

But Sheriff Defendants say that Plaintiff has not alleged a pattern of prior incidents of suicides resulting from these de facto policies.  Moreover, Plaintiff has not alleged how the deficiencies were the moving force behind any constitutional violation against Johnson or his suicide.  Lastly, Grimes and Gautreaux cannot be liable for any defects in the physical design of EBRPP, as that is the City/Parish's responsibility.  Sheriff Defendants assert that Plaintiff has not alleged actual or constructive knowledge on the part of the Sheriff or Warden, nor has she alleged deliberate indifference by these defendants.

Sheriff Defendants also contend that the Court should reject Plaintiff's claim of a policy of inadequate medical or mental health care, as no specific policy is identified.  Further, the City/Parish is responsible for contracting with EMS and PMS and is thus liable for any harm.

### b.  Plaintiff's Opposition

Plaintiff responds that inmate suicide cases are not necessarily episodic acts or omissions claims; indeed, a recent district court case found that a genuine issue of material fact precluded summary judgment on a condition of confinement claim in an inmate suicide case.  Plaintiff

41

claims that the conditions show a de facto policy under Fifth circuit case law. Such patterns and practices include "pervasive violence, objectively unreasonable use of force, ready access to dangerous synthetic marijuana, and [the] absence of mental health care," all of which "caused Mr. Johnson's death." (Doc. 38 at 10.) These policies were not "reasonably related to a legitimate governmental interest," so the Sheriff Defendant's motion should be dismissed. (Doc. 38 at 10.)

### c. Sheriff Defendants' Reply Memorandum

The Sheriff Defendants re-urge that Fifth Circuit case law has "uniformly held that inmate suicides involve 'episodic acts or omissions' claims rather than 'conditions of confinement claims.'" (Doc. 44 at 7.) Sheriff Defendants highlight how, in episodic act or omission claims, an actor is usually interposed between the detainee and the municipality, such that the detainee first complains of a particular act or omission by the actor, then points derivatively to a policy or custom of the municipality that permitted the act or omission.

Here, Plaintiff alleges that certain deputies witnessed Johnson's extreme emotional state yet ignored his condition. Sheriff Defendants claim this is such an episodic act or omission case. Similarly, the deputies' failure to follow EBRPP policy by not transporting Johnson to a mental health care professional or otherwise get him health care is another particular act or omission by the guards, not a condition of confinement. Sheriff Defendants claim that Plaintiff has failed to allege a policy or custom of the municipality that caused the acts or omissions, so the official capacity claims against Gautreaux and Grimes should be dismissed.

### 2. Analysis

To state a *Monell* claim, Plaintiff must allege: (1) an official policy or custom; (2) a policymaker who had actual or constructive knowledge of that policy or custom; and (3) "a

violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski*, 237 F.3d at 578.  The Court will address each of these requirements in turn.

### a.  Policies or Customs

"Municipal liability for section 1983 violations results if a deprivation of constitutional rights was inflicted pursuant to official custom or policy." *Piotrowski*, 237 F.3d at 579.  "Official policy is ordinarily contained in duly promulgated policy statements, ordinances or regulations." *Id*   A policy can also be demonstrated by a custom, which is: " 'a persistent, widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy[.]' " *Id.* (quoting *Webster v. City of Hous.*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc)).  " 'Actions of officers or employees of a municipality do not render the municipality liable under section 1983 unless they execute official policy as above defined.' " *Id.* (quoting *Webster*, 735 F.2d at 841).

Here, the Plaintiff sufficiently pled several customs. Specifically, Plaintiff claims that Kujawa, Canezaro, and the other deputy Sheriff Defendants failed to take certain actions "[c]onsistent with EBRPP's practice and custom," and these actions include the following:

- "fail[ing] to document the location of prisoners," which "allows, as in Mr. Johnson's case, EBRPP staff to move prisoners around the facilities with no accountability or supervision";

- "fail[ing] to monitor prisoners living areas, including the isolation cells in Unit II's M01," which allowed Johnson to hang himself "by failing to place Mr. Johnson in cell one or two, and by failing to physically walk the halls to monitor Mr. Johnson's cell even though they had knowledge of his acute emotional distress";

- "falsely document[ing] that EBRPP staff make regular monitoring rounds to supervise prisoners";

- "fail[ing] to provide Mr. Johnson sufficient access to qualified medical and mental health care";

43

- "physically assault[ing]" Johnson, which "exacerbated his mental illness and made it more likely, not less, that he would hurt himself";

(Doc. 27 at 13–14.)

The counts in the Amended Complaint provide further detail into the customs at EBRPP.

Count 1 describe *de facto* policies of Gautreaux and Grimes as follows:

> Such policies and practices include, but are not limited to, racial segregation of prisoner living areas, defects in physical design and manner of operation, including inadequate staffing, inadequate supervision techniques, poor sightlines, and inadequate monitoring of prisoner living areas that combined to result in frequent violence and a continuous pattern of constitutional deprivations for the prisoners in EBRPP, including Mr. Johnson.

(Doc. 27 at 16.) Count 2 claims that the "policies and practices adopted" by Gautreaux and Grimes, "whether explicit or *de facto* as evidenced by the extended and pervasive misconduct by EBRPPP . . . officials," include the same policies as alleged in Count 1. (Doc. 27 at 17–18.) Both of these counts allege that Gautreaux and Grimes "failed to provide appropriate medical and mental health services to EBRPP prisoners, including Mr. Johnson, who was individually harmed by the *de facto* policies and practices described above." (Doc. 27 at 17, 18.)

Viewing the Amended Complaint as a whole, the Court finds that the Plaintiff has, through the above allegations, sufficiently alleged several "persistent, widespread practice[s] of [EBRPSO and EBRPP] officials or employees, which, although not authorized by officially adopted and promulgated policy, [are] so common and well-settled as to constitute [] custom[s] that fairly represents municipal polic[ies.]"*Piotrowski*, 237 F.3d at 579 (citations omitted).

This conclusion is bolstered by the inmate declarations submitted by Plaintiff. Taken together, these documents show widespread practices in which (1) guards fail to not make necessary rounds to check on inmates; (2) logbooks are falsified; (3) inmates are segregated; (4) dangerous drugs are readily available; (5) violence from guards is prevalent; and (6) "[m]edical

44

care . . . is very bad." (Doc. 38-3 *in globo* & at 10.)  These practices largely parallel the allegations of the Amended Complaint and reinforce the Court's finding of specific policies and customs.

Two other alleged customs or policies are worth noting.  Specifically, Count 3 claims that Gautreaux violated Johnson's Eighth and Fourteenth Amendment rights by "coordinating with CITY-PARISH's [EMS] and [PMS] to provide inadequate and insufficient services for medical and mental health care that they knew would result in the deprivation of adequate medical and mental health care for prisoners with . . . serious mental health conditions." (Doc. 27 at 19.) Though a close call, the Court finds that this suffices to state a policy of the Sheriff.

Lastly, Count 6 alleges a *Monell* claim in which Gautreaux "establish[ed] and maintain[ed] policies, patterns or practices that [he] knew would deprive prisoners with serious medical conditions, namely, serious mental health disorders, of treatment for those disorders." (Doc. 27 at 21.)  Plaintiff also alleges a "policy, pattern, and practice of staff members at EBRPP engaging in excessive use of force and verbal and physical abuse of prisoners suffering with mental illness." (Doc. 27 at 21.)  The Court finds that these alleged policies are conclusory and do not, by themselves, articulate a policy.  However, the substance of these alleged policies and customs are fleshed out elsewhere in the Amended Complaint (and through the Plaintiff's attached inmate declarations), so Count 6 does not warrant dismissal on this ground alone.

In sum, the Court finds that the Plaintiff has pled several specific customs.  The Court thus turns to the next *Monell* requirement.

### b. Policymaker with Actual or Constructive Knowledge

The second question is whether the Plaintiff has sufficiently pled a policymaker with actual or constructive knowledge of the customs. The court will address each of these two parts in turn.

### i. Policymaker

The first part of this—a policymaker—is largely undisputed. Sheriff Defendants conceded for most of the claims that the Sheriff is the final policymaker in most of the areas pled by the Plaintiff. This Court wrote extensively about the division of responsibilities between the Sheriff and the City/Parish with respect to caring for inmates. (*See* Doc. 77 at 15–19.) That discussion need not be repeated here in full. In short, "it is the sheriff who has the duty of operating the jail facility." *Arce v. Louisiana*, 226 F. Supp. 3d 643, 649 (E.D. La. 2016) (citing La. Rev. Stat. § 15:704). "[The] Parish does not 'have authority over the operations of the jail or the management of the sheriff's employees working therein.' " *Id.* (quoting *Salvagio v. Doe*, No. 13–5182, 2013 WL 6623921, at *3 (E.D. La. Dec. 16, 2013) (Vance, J.)); *see also Fairley v. Stalder*, 294 Fed. Appx. 805, 812 (5th Cir. 2008) ("[W]e agree that day-to-day operation of the parish prison is the responsibility of the local sheriff, and that financing and maintenance are the responsibility of the local governing authority."). Thus, "the parish governing authority is responsible for ensuring that the jail has a health care provider, and for funding the prisoners' medical care-However, the sheriff is responsible for overseeing how the medical care is provided because he controls the inmates of the jail, its employees, and its daily operations." *Serigny v. Lafourche Par. Gov't ex rel. Charlotte Randolph Par. President*, No. 10-3205, 2012 WL 3548029, at *3 (E.D. La. Aug. 16, 2012), *aff'd sub nom. Serigny v. Lafourche Par. Gov't ex rel.*

*Randolph*, 547 F. App'x 582 (5th Cir. 2013) (citing *O'Quinn v. Manuel*, 773 F.2d 605, 609 (5th Cir. 1985); La. Rev. Stat. Ann. §§ 15:703, 33:1435).

The Sheriff Defendants only make an issue of the policymaker question indirectly with respect to Plaintiff's Count 3.  As stated above, Plaintiff alleges that Gautreaux violated Johnson's rights by "coordinating with CITY-PARISH's [EMS] and [PMS] to provide inadequate and insufficient services for medical and mental health care that they knew would result in the deprivation of adequate medical and mental health care for prisoners with . . . serious mental health conditions." (Doc. 27 at 19.)

While the Court agrees that EMS and PMS are divisions of the City/Parish and not the EBRPSO, the Court finds that the operative word here is "coordinating."  Gautreaux's alleged constitutional violations lie in the failure of his employees to properly "coordinate" with the City/Parish, which resulted in the provision of "inadequate and insufficient services for medical and mental health care" for prisoner. (Doc. 27 at 19.)  Thus, Gautreaux is not regulating EMS or PMS; he and his employees merely "coordinate" with them to discharge their duty to provide medical care to inmates.

### ii.    Actual or Constructive Knowledge

The question then becomes whether Gautreaux and Grimes had actual or constructive knowledge of the above customs and policies.  "Actual or constructive knowledge of [a] custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority." *Piotrowski*, 237 F.3d at 579 (quoting *Webster,* 735 F.2d at 842).  Elaborating on these requirements, the Fifth Circuit has stated:

> Actual knowledge may be shown by such means as discussions at council meetings
> or receipt of written information. Constructive knowledge may be attributed to the
> governing body on the ground that it would have known of the violations if it had
> properly exercised its responsibilities, as, for example, where the violations were

so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity.

*Hicks-Fields v. Harris Cty., Tex.*, 860 F.3d 803, 808–09 (5th Cir. 2017) (quoting *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984) (en banc)).

Though a close call, the Court finds that the Plaintiff has sufficiently alleged actual or constructive knowledge on the part of Gautreaux and Grimes of the above customs and policies. The Court bases this decision on the following:

- According to Plaintiff, "[m]edia reports subsequent to Mr. Johnson's death quote health care professionals noting a 'significant decline in the quality of care . . . over the past six or seven years,' crucial health conditions at the prison, and chronic understaffing." (Doc. 27 at 11.)

- Further, "[a] recent independent evaluation of the system called the health care provided to prisoners at EBRPP 'episodic and inconsistent.' " (Doc. 27 at 11.)  This statement— that healthcare at EBRPP was "episodic and inconsistent"—was noted in an article in Baton Rouge's local newspaper, and this article was included as one of Plaintiff's exhibits. (Doc. 38-4 at 3.)  The full quote in context is worth noting:

  > Harrowing stories from the prison's nurses and doctors in the fall spurred the parish Metro Council to approve a $95,000 contract with Chicago-based Health Management Associates to study the prison's medical services.  The group's consultants have spent the past several months interviewing the prison's medical workers and other city-parish leaders to determine the areas most in need of change.

  > The first challenge, the consultants said, is to persuade the public to consider prison health care as part of the continuum of health providers in the city-parish.  New leadership will be needed to make that happen, they said, noting that a lack of standard protocols and checks and balances has led to "episodic and inconsistent" health care in the prison."

  (Doc. 38-4 at 3.)

- Plaintiff claims that the "failures of all defendants are well known and consistent with a pattern and practice resulting in a decrepit physical plant, rampant violence, and deliberate indifference to the basic human needs, including medical and mental health care, of prisoners at EBRPP." (Doc. 27 at 15.)

- Plaintiff cites to at least four individuals dying at the jail since 2013 "due to inadequate medical and mental health care." (Doc. 27 at 15.)

48

- Plaintiff specifically alleges that "in October of 2015, defendant GAUTREAUX was cited as requesting a new jail 'for years' and that 'officials long ago identified the problem: a dilapidated facility that is ill-equipped to hold . . . mentally ill who are booked.' " (Doc. 27 at 15.)

- Lastly, Plaintiff asserts that, "[i]n February of 2016, a seventeen-year-old boy died at the hands of his cellmate. Even though witnesses could hear the victim cry 'I give up,' EBRPP staff did not intervene in time to stop the murder." (Doc. 27 at 15.)

Construing these allegations in a light most favorable to the Plaintiff—as the Court must at this stage—the Court finds that Plaintiff has sufficiently pled that Gautreaux and Grimes either knew about the policies and customs of EBRPP or that they would have known had they exercised their responsibilities properly. All of the above allegations—including Gautreaux's statement, the "media reports" and newspaper articles, the "independent evaluation," and the other inmates' death—demonstrate that the problems with the jail were the "subject of . . . a high degree of publicity." *Hicks-Fields*, 860 F.3d at 809, At the very least, Plaintiff has alleged facts which raise a reasonable hope or expectation that discovery will revel relevant evidence as to this element of Plaintiff's claim, *Lormand*, 565 F.3d at 257, and this is all that is required at the motion to dismiss stage.

### c. Constitutional Violations Whose "Moving Force" Are the Policies and Customs

#### i. Relevant Standard

This leaves the final requirement of *Monell* liability. "Although an official policy can render a municipality culpable, there can be no municipal liability unless it is the moving force behind the constitutional violation." *James v. Harris Cty.*, 577 F.3d 612, 617 (5th Cir. 2009) (citing *Piotrowski*, 237 F.3d at 580). "In other words, a plaintiff must show direct causation, i.e., that there was 'a direct causal link' between the policy and the violation." *Id.* (citing *Piotrowski*, 237 F.3d at 580). *See also Johnson v. Deep East Tex. Reg'l Narcotics Trafficking Task Force,*

379 F.3d 293, 310 (5th Cir. 2004) (quoting *Fraire v. City of Arlington,* 957 F.2d 1268, 1281 (5th Cir. 1992) ("must be more than a mere 'but for' ")).

"A plaintiff must also show that, where the official policy itself is not facially unconstitutional, it was adopted 'with "deliberate indifference" as to its known or obvious consequences.' " *James,* 577 F.3d at 617 (quoting *Johnson,* 379 F.3d at 309). "Deliberate indifference is a degree of culpability beyond mere negligence or even gross negligence; it 'must amount to an intentional choice, not merely an unintentionally negligent oversight.' " *Id.* at 617–18 (quoting *Rhyne v. Henderson County,* 973 F.2d 386, 392 (5th Cir.1992)).

"To succeed [in alleging 'moving force' causation], 'a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.' *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (quoting *Bd. of the County Comm'rs v. Brown,* 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)). "That is, 'the plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision.' " *Id.* (quoting *Brown*, 520 U.S. at 411, 117 S. Ct. 1382). "Of the moving force and deliberate indifference elements of municipal liability, [the Fifth Circuit has] stressed: 'These requirements must not be diluted, for "[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability." ' " *James*, 577 F.3d at 618 (quoting *Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998) (quoting *Brown*, 520 U.S. 397, 117 S. Ct. at 1382)).

### ii.    Characterization of Constitutional Violations

The first issue for this element is whether the underlying constitutional violations should be characterized as episodic acts or omissions (as Defendant argues) or additionally as attacks on conditions of confinement (as Plaintiff argues). As will be discussed below, the Court finds that the Plaintiff has stated claims under both theories.

Preliminarily, the Court notes that "[t]he constitutional rights of a pretrial detainee flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment. . . . In contrast, an inmates' rights arise from the Eighth Amendment." *Cleveland*, 198 F. Supp. 3d at 733 & n. 10.  Here, the Plaintiff began his time at EBRPP jail as a pretrial detainee, pled guilty, and then became an inmate.  However, it is unclear from the Amended Complaint when he consumed the mojo and began experiencing the severe emotional distress that lead to his death.

Given this lack of clarity, and given the fact that all facts must be construed in a light most favorable to the plaintiff, the Court will analyze Plaintiff's claims under both the Fourteenth and Eighth Amendments.[8] The Court will begin with the Fourteenth Amendment and then turn to the Eighth Amendment.

### A.    Fourteenth Amendment

While an episodic act or omission involves an official having "subjective knowledge of a substantial risk of serious harm to the detainee and respond[ing] to that risk with deliberate indifference," *Hare II*, 74 F.3d at 650, a condition of confinement claim is a "[c]onstitutional attack[ ] on general conditions, practices, rules, or restrictions of pretrial confinement." *Scott v.*

---

[8] The Court notes, however, that if discovery reveals that the claims should only be analyzed under the Eighth Amendment, the Court will almost certainly dismiss the Fourteenth Amendment claim at a later stage.  But, the Court need not make that determination at this time.

*Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (quoting *Hare II*, 74 F.3d at 644).  In these cases, the "reasonable relationship test of *Bell v. Wolfish*, 441 U.S. 520, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979) is apposite[.]" *Id.* (citing *Hare*, 74 F.3d at 645).  The court assumes "by the municipality's very promulgation and maintenance of the complained-of condition that it intended to cause the alleged constitutional deprivation" *Id.* (citing *Hare*, 74 F.3d at 645). "Under *Wolfish*, 441 U.S. at 539, 99 S. Ct. at 1874, a constitutional violation exists only if we then find that the condition of confinement is not reasonably related to a legitimate, non-punitive governmental objective." *Id.* (citing *Hare*, 74 F.3d at 640).

Again, the first key question is how the claim should be characterized.  In *Hare II*, the Fifth Circuit provided guidance on this issue.  There the Court stated:

> When a pretrial detainee's constitutional claim is based on particular acts or omissions by one or more jail officials, the difficult question is whether the challenged act or omission can be characterized as episodic. For the *Bell* test to apply, a jailer's act or omission must implement a rule or restriction or otherwise demonstrate the existence of an identifiable intended condition or practice. If a pretrial detainee is unable to point to such an established rule or restriction, then he must show that the jail official's acts or omissions were sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials, to prove an intended condition or practice to which the *Bell* test can be meaningfully applied. Otherwise, in the absence of such a condition, practice, rule, or restriction, a jail official's act or omission can give rise to constitutional liability only if he was culpable, under an appropriate legal standard, with respect to the harm to the detainee.

*Hare II,* 74 F.3d at 645.

Later, in *Scott v. Moore*, 114 F.3d 51 (5th Cir. 1997), the Fifth Circuit provided further guidance.  In *Scott*, a pretrial detainee was sexually assaulted by a guard. *Id.* at 52.  Plaintiff claimed that this was the result of constitutionally inadequate staffing—that is, a condition of confinement. *Id.*  The Fifth Circuit explained, as stated above, that a " 'condition of confinement' case is a 'constitutional attack on general conditions, practices, rules, or restrictions of pretrial confinement.' " *Id.* at 53 (quoting *Hare II*, 74 F.3d at 644).  "Hence, where a detainee complains

of the number of bunks in a cell or his television or mail privileges, the wrong of which the

detainee complains is a general condition of confinement." *Id.* "In contrast, where the

complained-of harm is a particular act or omission of one or more officials, the action is

characterized properly as an 'episodic act or omission' case and is not amenable to review"

under the *Bell* test. *Id.* (citing *Hare II*, 74 F.3d at 645). The Fifth Circuit then provided the

following guidelines for distinguishing between these two theories:

> In an "episodic act or omission" case, an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission.

*Id.* The Fifth Circuit then concluded that plaintiff's claim was more appropriately characterized
as an episodic act or omission one:

> Although, in her amended state petition, [plaintiff] complains generally of inadequate staffing, i.e., "by having only one individual on duty, and/or by not having a female member present when female prisoners are confined," the actual *harm* of which she complains is the sexual assaults committed by [the guard] during the one eight-hour shift-an episodic event perpetrated by an actor interposed between [the plaintiff] and the city, but allegedly caused or permitted by the aforesaid general conditions.

> In many jail condition cases, the conditions themselves constitute the harm. This is true, for example, where inadequate food, heating, or sanitary conditions themselves constitute miserable conditions. Here, however, [plaintiff] did not suffer from the mere existence of the alleged inadequate staffing, but only from [plaintiff's] specific sexual assaults committed on but one occasion.

> Consequently, this case does not fit well within the conditions-of-confinement category and, in fact, bears a closer resemblance to cases regarding episodic acts by prison employees.

*Id.* at 53–54.

Later, in *Flores v. Cty. Of Hardeman, Tex.*, 124 F.3d 736 (5th Cir. 1997), the Fifth

Circuit affirmed the granting of summary judgment in favor of the county and sheriff. *Id.* at 737.

In *Flores*, after the decedent was arrested, the sheriff had ordered that certain precautions be

taken (e.g., being checked twice as often and being given only a mattress and pillow) because the sheriff had known the detainee his whole life and felt that that the detainee was not acting like himself. *Id.* The next day, there was no threat or attempt at suicide or signs that the detainee intended to commit suicide. *Id.*  The detainee was arraigned, and, after, he was issued, among other things, a blanket. *Id.* at 737.  Protective measures were discontinued after twelve hours. *Id.* at 739.  When, later in the afternoon, an officer could not see the detainee during rounds, officers entered his cell, and the detainee was found hanging by a piece of blanket. *Id.* at 737.

The Court first decided whether the claim was an episodic act or omission claim or a condition of confinement claim.  Plaintiff argued that it was both—episodic based on the sheriff's acts and omissions, and a "conditions" case "based on training and staffing policies" in the county. *Id.* at 738.  After describing the above standard from *Scott*, the Fifth Circuit briefly concluded, "it is clear after *Hare* and *Scott* that this is an episodic act or omission case." *Id.*

Unlike *Hare II*, *Scott*, and *Flores*, in *Shepherd v. Dallas County*, 591 F.3d 445 (5th Cir. 2009), the Fifth Circuit found that the district court properly characterized a pretrial detainee's claim as one attacking conditions of confinement.  In *Shepherd*, the plaintiff, who suffered hypertension and had been taking Clonidine twice daily as treatment, was, while in jail, given a different medication; then, months later, after having extremely high blood pressure, was prescribed Clonidine; then, for seven weeks, was not given his medicine as prescribed and did not have his blood pressure checked, despite repeated complaints by plaintiff and his wife to jail staff and medical personnel about the lack of treatment; and, finally, suffered a stroke. *Id.* at 449–50.

After surviving summary judgment on his condition of confinement claim, plaintiff

presented at trial "extensive evidence on the jail's treatment of inmates with chronic illness." *Id.*

at 450. The Fifth Circuit stated:

> Witnesses, including the jail's Medical Director at the time of [plaintiff's]
> confinement, the jail's pharmacist, and an employee of the medical services
> contractor responsible for monitoring the jail's contract, testified that the jail's
> medical program was understaffed to the point that routine treatment could not be
> provided; that at times, no medical personnel were present at the jail; that fifty
> percent or more of prescriptions regularly went undelivered to inmates; that records
> concerning medication administration were regularly falsified; and that Dallas
> County officials had been repeatedly notified of these problems.

*Id.* Plaintiff also submitted "[t]wo extensive reports" that supported plaintiffs' claims; the first

was a "comprehensive review of the health services" at the jail performed by Dr. Puisis, an

expert in correctional health, and his team, and the second was a Department of Justice report

that "concluded that the jail was operating in violation of inmates' constitutional right to

adequate medical care." *Id.* at 450–51. The Court detailed the findings of both reports.[9]

---

[9] The Fifth Circuit summarized the findings of the first report as follows:

> • The jail has "*no* capacity to diagnose illness at intake" (emphasis in the original). Further, "There
> is no policy or procedure for how inmates who come into the jail at intake are to receive their
> medication or be referred to a physician." Overall, "only about 25% of incoming inmates with a
> chronic illness are actually physically seen by a physician following *451 intake," with the result
> that "[p]atients with chronic illness ... may never be adequately evaluated."

> • "The sick call process in Dallas County Jail is not adequate and its steady state is that inmates, by
> attrition, leave the jail before being seen more frequently than being appropriately evaluated." Dr.
> Puisis found "multiple barriers to access" to care, including a dysfunctional "kite" system for inmate
> requests; the lack of timely review of health care requests by nurses; the unavailability of officers
> to bring inmates for health services; the lack of adequate capacity to examine inmates who manage
> to appear at sick call; and understaffing of physicians.

> • Monitoring of inmates with chronic conditions is "poor to non-existent." Specifically: "There are
> no policies, procedures or chronic care guidelines that are used in the management of chronic
> diseases. There is no mechanism to track individuals who have a chronic illness ..., and there is no
> mechanism in place to assign acuity to patients with chronic illness." Generally, inmates with
> chronic illness are seen only "when their conditions deteriorate to an urgent status"; inmates whose
> conditions have not yet reached that point "usually are discharged before being seen" by a doctor.
> The result of this system, according to Dr. Puisis's review of inmate medical charts, is "disease
> deterioration to the point of requiring hospitalization."

*Shepherd*, 591 F.3d at 450–51. As to the DOJ investigation, the Court stated:

On appeal, the county argued that the district court erred in characterizing Plaintiff's

claim as an attack on conditions of confinement rather than episodic acts or omissions. *Id.* at 452.

After discussing the standards laid out by *Hare II* and *Scott*, and after noting that "[p]roving a

pattern is a heavy burden, one that has rarely been met in our caselaw," the Fifth Circuit rejected

the county's argument and found that the case was properly characterized as an attack on

conditions of confinement. *Id.* at 452.  The appellate court briefly summarized a few episodic

acts or omissions cases, including *Scott* and *Hare II*, and then stated:

> [Plaintiff's] claim, by contrast, does not implicate the acts or omissions of
> individuals but the jail's system of providing medical care to inmates with chronic
> illness. His original complaint contains the full theory of the case: The jail's
> evaluation, monitoring, and treatment of inmates with chronic illness was, at the
> time of [plaintiff's] stroke, grossly inadequate due to poor or non-existent
> procedures and understaffing of guards and medical personnel, and these
> deficiencies caused his injury. [Plaintiff] relied on evidence showing that the
> inadequate treatment he received in a series of interactions with the jail's medical
> system inevitably led to his suffering a stroke. To demonstrate the existence of an
> unlawful condition, he presented extensive independent evidence on the jail's
> treatment of inmates with chronic illness. This evidence included a comprehensive
> evaluative report commissioned by the County, the DOJ report, affidavits from
> employees of the jail and its medical contractor attesting to the accuracy and
> applicability of the reports, and a plethora of additional documentary evidence.
> From this evidence, the court could reasonably infer a de facto jail policy of failing
> properly to treat inmates with chronic illness.

---

> In on-site inspections in February and March 2006, the DOJ found that the jail "fails to adequately
> identify inmates' health needs through appropriate intake screening, thereby preventing inmates
> from receiving adequate care for acute or chronic needs." The jail "has no clinical practice guidelines
> for chronic and communicable diseases," including hypertension. It "fails to ensure that inmates
> receive thorough assessments and monitoring of their chronic illnesses." Care for inmates with
> chronic conditions is "plagued by delays in the treatment and administration of medication." Like
> Dr. Puisis, the DOJ found that the system for obtaining medical treatment was "inadequate" due, in
> large part, to "significant" barriers to access, including a complete lack of any protocols for
> collecting, processing, distributing, logging, and triaging medical requests. The jail regularly lost
> track of inmates with chronic illness and, overall, "fails to provide adequate treatment for their
> needs." The DOJ was particularly critical of the jail's system of administering medication, as a result
> of which "inmates routinely miss doses of life-sustaining medications." The DOJ identified
> numerous cases where inmates suffered or died because of the jail's inadequate treatment of chronic
> conditions. It concluded that the jail was operating in violation of inmates' constitutional right to
> adequate medical care.

*Id.* at 451.

> . . . [I]solated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate. Nor can the incidence of diseases or infections, standing alone, imply unconstitutional confinement conditions, since any densely populated residence may be subject to outbreaks. Allegations of insufficient funding are similarly unavailing. Rather, a detainee challenging jail conditions must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs; any lesser showing cannot prove punishment in violation of the detainee's Due Process rights. Here, Shepherd demonstrated that serious injury and death were the inevitable results of the jail's gross inattention to the needs of inmates with chronic illness. In the absence of any legitimate penological or administrative goal, this amounts to punishment.

*Id.* at 453–54. Accordingly, the Court found that the district court did not improperly classify plaintiff's suit at the summary judgment stage.

Here, the Court finds that Plaintiff's claims may be properly characterized as attacks on both conditions of confinement claims and episodic acts and omissions. Plaintiff is entitled to pled both claims in the alternative, *see Shepherd*, 591 F.3d at 452 n. 1, and that is precisely what Plaintiff did.

It is absolutely clear that Plaintiff's claims arise at least in part from the actions of some of the lower-level Sheriff Defendants, and this requires little explanation. Indeed, the Sheriff Defendants concede that Plaintiff pled episodic acts or omissions claims against the deputies, though they dispute the truth of these allegations and argue in this motion that causation is lacking. (*See* Doc. 32-1 at 14.)[10]

---

[10] Defendants state:

> In this case, the Plaintiff amended her complaint to allege that "Defendants Kujawa, Canezaro and J. Does #50-99 witnessed Mr. Johnson's extreme emotional distress and suicidal statements but chose to ignore his condition." Defendants Kujawa and Canezaro deny this allegation. However, for purposes of this motion, this Court must accept this allegation as true and therefore, whether these defendants violated Mr. Johnson's constitutional right by acting with deliberate indifference to a known suicidal impulse is not at issue in this motion.

(Doc. 32-1 at 14.)

But, the Court also finds that Plaintiffs has pled several ubiquitous policies and practices at EBRPP that caused Johnson's death.  These include "racial segregation of prisoner living areas, defects in physical design and manner of operation, including inadequate staffing, inadequate supervision techniques, poor sightlines, and inadequate monitoring of prisoner living areas," all of which "combine[] to result in frequent violence and a continuous pattern of constitutional" violations. (Doc. 27 at 16.)  Again, according to the Amended Complaint, "[m]edia reports subsequent to Mr. Johnson's death quote health care professionals noting a 'significant decline in the quality of care . . . over the past six or seven years,' crucial health conditions at the prison, and chronic understaffing," and "[a] recent independent evaluation of the system called the health care provided to prisoners at EBRPP 'episodic and inconsistent.' " (Doc. 27 at 11.)  Lastly, the prisoner declarations further demonstrate the prevalence of (1) guards failing to make rounds and falsifying logbooks, (2) inmates being segregated, (3) dangerous drugs, (4) violence from guards, and (5) "very bad" medical care.  (Doc. 38-3 *in globo*.)

Taking all of these allegations together, the Court finds that the Plaintiff has pled "sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials, to [demonstrate] an intended condition or practice" to which condition of confinement analysis applies. *Hare II*, 74 F.3d at 645.  As in *Shepherd*, Johnson's death came not just from a single incident but from a "series of interactions with the jail's medical system" that "inevitably led to his" death and from medical care that was "grossly inadequate due to poor or non-existent procedures and understaffing of guards and medical personnel," among other issues outlined above. *Shepherd*, 591 F.3d at 453–54.

Further, Plaintiff has specifically alleged that, "[s]ince 2013, at least four people died at the jail due to inadequate medical and mental health care[.]  (Doc. 27 at 15.)  Thus, these constitutional inadequacies are not mere "isolated examples"; Plaintiff's allegations raise a reasonable expectation that discovery will lead to admissible evidence of exactly the type of "pervasive pattern of serious deficiencies in providing for . . . basic human needs" contemplated by *Shepherd* and required for a Fourteenth Amendment violation. *Shepherd*, 591 F.3d at 454.

Additionally, "to constitute impermissible punishment, the condition must be one that is 'arbitrary or purposeless' or, put differently, 'not reasonably related to a legitimate goal." *Shepherd*, 591 F.3d at 452 (citing *Bell*, 441 U.S. at 539, 99 S Ct. at 1874).  The Court finds that the conditions detailed in the Amended Complaint satisfy this requirement.

This Court recognizes the admonitions from *Bell* highlighted by the Fifth Circuit:

> The [*Bell*] Court explained that "the effective management of the detention facility . . . is a valid objective that may justify imposition of conditions and restrictions of pretrial detention." [*Bell*, 441 U.S.] at 540, 99 S. Ct. 1861. The Court reminded that in determining "whether restrictions or conditions are reasonably related to the Government's interest in . . . operating the institution in a manageable fashion," courts must remember that " '[s]uch considerations are peculiarly within the province and professional expertise of corrections officials.' " *Id.* at 540 n. 23, 99 S.Ct. 1861 (quoting *Pell v. Procunier,* 417 U.S. 817, 827, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974)). Courts must not become "enmeshed in the minutiae of prison operations," which will only distract from the question presented: "does the practice or condition violate the Constitution?" *Id.* at 544, 562, 99 S. Ct. 1861.

*Reed*, 795 F.3d at 467–69 (granting motion for summary judgment on condition of confinement because the "multi-tiered staffing arrangement [at the jail had] a reasonable relation to providing medical attention to inmates with varying levels of need" and because plaintiff demonstrated only "isolated examples," namely one other death in the four months before the incident in question).

However, as this Court stated in *Cleveland*:

> "The Fourteenth Amendment requires that state officials not disregard the 'basic human needs' of pretrial detainees, including medical care." *Reed v. Krajca (Estate of Henson)*, 440 F. App'x 341, 343 (5th Cir. 2011). Put differently, "the substantive limits on state action set by the Due Process Clause provide that the state cannot punish a pretrial detainee." *Reed*, 795 F.3d at 462 (citing *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1872, 60 L. Ed. 2d 447, 466 (1979)). Any "punishment" of a pretrial detainee, therefore, will run afoul of the Constitution. *Duvall v. Dallas Cty., Tex.*, 631 F.3d 203, 206 (5th Cir. 2011).

*Cleveland*, 198 F. Supp. 3d at 733. Here, the Court finds that, at the motion to dismiss stage, Plaintiff has made allegations that, if true, raise a reasonable expectation that discovery will reveal evidence showing that the conditions at EBRPP deprived Johnson of his basic human needs and amounted to punishment in violation of the Fourteenth Amendment.

## B.    Eighth Amendment

The Court further finds that the plaintiff has stated a conditions of confinement claim under the Eighth Amendment. "To plead an Eighth Amendment violation based on the conditions of an inmate's confinement, a plaintiff must allege conditions that 'pos[e] a substantial risk of serious harm.'" *Hinojosa*, 807 F.3d at 665 (quoting *Farmer*, 511 U.S. at 834, 114 S Ct. 1970). "The plaintiff must also allege that the defendant prison officials were deliberately indifferent to the inmate's health or safety." *Id.* (citing *Farmer*, 511 U.S. at 834, 114 S. Ct. 1970). "This requires more than an allegation of mere negligence, but less than an allegation of purpose or knowledge." *Id.* (citing *Farmer*, 511 U.S. at 835–36, 114 S. Ct. 1970). "Rather, a prison official acts with deliberate indifference when he 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quoting *Farmer*, 511 U.S. at 837, 114 S. Ct. 1970).

As outlined extensively above, the Amended Complaint sufficiently alleges that Sheriff Gautreaux and Warden Grimes were aware of the conditions at EBRPP and that those conditions

posed a substantial risk of serious harm to inmates, including Johnson. Indeed, as alleged, the conditions detailed by Plaintiff constitute "extreme deprivations" and "inhumane" conditions "involving the wanton and unnecessary infliction of pain." *Cleveland*, 198 F. Supp. 3d at 733 n. 10 (citations and alterations omitted).

As to Eighth Amendment episodic acts or omission claims, this standard parallels the standard for such claims under the Fourteenth Amendment. *See Cleveland*, 189 F. Supp. 3d at 734 n. 11; *see also Thomas v. Mills*, 614 F. App'x 777, 778 (5th Cir. 2015) (observing that "the deliberate indifference standard articulated by the Supreme Court in *Farmer v. Brennan* . . . applies to pretrial detainees and convicted prisoners alike" (citations omitted)). Thus, for the same reasons articulated above, Plaintiff has sufficiently pled violations of his Eighth Amendment right to cruel and unusual punishment.

Additionally, "[t]o succeed in holding a municipality accountable" for an episodic act or omission violation, the inmate or detainee "must show that the municipal employee's act resulted from a municipal policy or custom adopted or maintained with *objective* deliberate indifference to the detainee's [or inmate's] constitutional rights." *Scott*, 114 F.3d at 54 (citing *Farmer*, 511 U.S. at 841, 114 S Ct. 1970). Thus, in *Scott*, the Fifth Circuit rejected a claim against the city because none of the plaintiff's evidence "establish[ed] that the city knew or should have known of the risk attendant to its staffing policy" and because, though the evidence "may be construed to suggest that the jail could have been managed better, or that the city lacked sufficient prescience to anticipate that a well-trained jailer would, without warning, assault a female detainee," neither of those things "reflect[ed] objective deliberate indifference to the [detainee's] constitutional rights." *Id.* at 54–55.

Here, the Court finds, as detailed extensively in prior sections, that the Sheriff and Warden's had actual or constructive knowledge of the above conditions, practices, and customs, this knowledge, combined with their disregard of the obvious risks associated with those conditions and policies, demonstrates objective deliberate indifference.

In sum, Plaintiff has stated a cognizable claims attacking episodic acts or omissions and conditions of confinement under the Eighth and Fourteenth Amendments. The Court turns to the final subissue in this analysis.

### iii.     Moving Force

Sheriff Defendants argue that Plaintiff has failed to allege a policy or custom that caused the constitutional violations at issue. The Court disagrees.

The Amended Complaint details at length how the various unconstitutional customs in place at EBRPP directly caused Johnson's death. Plaintiff specifically alleges that Kujawa and Canezaro and other officials "witnessed Mr. Johnson's extreme emotional distress and suicidal statements but chose to ignore his condition"; that, despite their observations, these officials "failed to follow EBRPP policy by not transporting Mr. Johnson to a mental health or any other health care professional, or otherwise seeking mental health care for Mr. Johnson"; that "[d]espite the obvious indications that Mr. Johnson was suffering an emotional breakdown, was suicidal, and in acute mental health distress, EBRPP officials failed to perform a mental health assessment of Mr. Johnson" ; and that, after Johnson was transferred in such a way "as a means to deny such prisoners access to mental health care," the lower-level Sheriff Defendants falsified logbooks to indicate that they made rounds.  (Doc. 27 at 8–10)

Plaintiff further alleges that each of these actions were "[c]onsistent with EBRPP's practice and custom" (Doc. 27 at 13–14), and the inmate declarations reinforce this. Those

practices and customs have been described several times in this opinion and need not be repeated again.

All of this demonstrates a "direct causal link" between the policies and customs at issue, the constitutional violations detailed above, and Johnson's death. This is easily more than "but for" causation. As a result, the Court finds that the Plaintiff has sufficiently pled claims against Gautreaux and Grimes in their official capacity, and the Sheriff Defendants' motion to dismiss on this issue is denied.

### H. Claim for Punitive Damages Against the Sheriff Defendants in their Official Capacity

Defendant also seeks dismissal of the claims for punitive damages against the Sheriff Defendants in their official capacity. Plaintiff does not dispute or even address this.

The Court agrees with the Sheriff Defendants and finds that Plaintiff is not entitled to punitive damages under § 1983 for claims against them in their official capacity. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271, 101 S. Ct. 2748, 2762, 69 L. Ed. 2d 616 (1981) ("we hold that a municipality is immune from punitive damages under 42 U.S.C. § 1983."). Accordingly, these claims are dismissed with prejudice. No leave to amend is granted on this issue, as any such amendment would be futile.

### I. Claims against Columbia

Columbia "adopt[ed] in full" the motion to dismiss filed by the Sheriff Defendants, as well as the arguments made by the City/Parish in its motion to dismiss. (Doc. 55) Plaintiff asserts that, because Columbia issued a liability policy for Sheriff Gautreaux and the EBRPSO, "Columbia's exposure in this lawsuit is therefore derivative of the liability of" Gautreaux and his employees (Doc. 59)

Accordingly, as both sides appear to agree on this issue, the Court grants and denies Columbia's motion to dismiss to the same extent the Sheriff Defendants' and City/Parish's motions to dismiss were granted and denied.  Since the City/Parish's motion to dismiss was denied in full (Doc. 77), the claims against Columbia are dismissed to the same extent the other claims in this ruling were dismissed.

## IV.    Conclusion

Accordingly,

**IT IS ORDERED** that the *Motion to Dismiss* (Doc. 32) filed by Defendants, Sheriff Sid J. Gautreaux, III, in his individual and official capacity as Sheriff of East Baton Rouge Parish, and Lieutenant Colonel Dennis Grimes, Lieutenant Michael Duplessis, Deputy Avery Kujawa, Deputy Dalton Canezaro, and Corporal Cedric Buckner (collectively, "Sheriff Defendants") is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that the Court will **DEFER** ruling on whether Duplessis is entitled to qualified immunity and will allowed limited discovery on Duplessis' personal knowledge and personal conduct as it relates to Johnson and the circumstances leading to his death.

**IT IS FURTHER ORDERED** that the Sheriff Defendants' *Motion to Dismiss* is granted in that the following claims are dismissed: (1) Plaintiff's § 1983 claims against Duplessis, Kujawa, Canezaro, and Buckner in their official capacity; (2) Plaintiff's claims against Gautreaux and Grimes for failure to supervise; and (3) all claims for punitive damages against the Sheriff Defendants in their official capacity.

**IT IS FURTHER ORDERED** that, as allowed in this opinion, Plaintiff is given twenty-one (21) days in which to amend the Amended Complaint and cure the deficiencies.  If she fails to do so, these claims will be **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that *Columbia Casualty Company's Motion to Dismiss and Incorporated Memorandum in Support* (Doc. 55) is **GRANTED IN PART** and **DENIED IN PART**, to the same extent as the motion against the Sheriff Defendants is granted and denied. The claims against Columbia are dismissed to the same extent as the claims against the Sheriff Defendants are dismissed, as detailed in this ruling.

Signed in Baton Rouge, Louisiana, on <u>August 25, 2017</u>.


_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**